John G. MILES, Plaintiff–Appellant,

v.

**DENVER PUBLIC SCHOOLS,**
Defendant–Appellee.

No. 90–1122.

United States Court of Appeals,
Tenth Circuit.

Sept. 11, 1991.

Larry F. Hobbs (Rita Byrnes Kittle of Hornbein, MacDonald, Fattor, and Hobbs, P.C., Denver, Colo., with him on the briefs) of Hornbein, MacDonald, Fattor, and Hobbs, P.C., Denver, Colo., for the plaintiff-appellant.

Patrick B. Mooney (Martin Semple of Semple & Jackson, P.C., Denver, Colo., with him on the brief) of Semple & Jackson, P.C., Denver, Colo., for defendant-appellee.

Before TACHA and EBEL, Circuit Judges, and VAN BEBBER, District Judge.[*]

TACHA, Circuit Judge.

This appeal arose out of an incident in which plaintiff-appellant John Miles, a public high school teacher in Denver, Colorado, was disciplined for statements he made in the classroom. Miles seeks damages and injunctive relief pursuant to 42 U.S.C. § 1983, claiming the defendant school district violated his first amendment free speech rights. The district court granted summary judgment in favor of the school. On appeal, Miles argues the district court erred in granting summary judgment for the defendant because there are genuine issues of material fact to be determined before the first amendment issue can be decided. Miles also asserts his classroom expression is protected by the first amendment and the letter of reprimand unconstitutionally regulates his speech. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm the district court's grant of summary judgment.

## I. BACKGROUND

During a ninth grade government class, Miles stated that the quality of the school had declined since 1967. When a student asked for specific examples, Miles replied that in the past the school did not have so many pop cans lying around and school discipline was better. He also commented, "I don't think in 1967 you would have seen two students making out on the tennis court." This comment referred to an incident that allegedly had occurred the previous day and was the topic of rumor throughout the school. The rumor was that two students were observed having sexual intercourse on the tennis court during lunch hour. Miles had heard the rumor from a colleague who had heard of the incident from two students claiming to have witnessed it. Miles never sought official confirmation of the rumor before repeating it in class.

Miles' comments about the rumor led parents of the alleged participants to complain to the principal. Following meetings with Miles and several other individuals, the principal placed Miles on paid administrative leave for four days. Miles wrote to the principal apologizing for exercising "bad judgment." The principal conducted an investigation and issued a reprimand letter that stated:

> After completing the investigation of the alleged incident in your period 3 class on March 30, 1989, I find it necessary to write you this letter of reprimand. The investigation revealed that you displayed poor judgment in your comment "making out" on the tennis court. Informing your students of an alleged incident of one of your tennis players "making out"

* The Honorable G. Thomas Van Bebber, United States District Court for the District of Kansas, sitting by designation.

with a female student on the tennis courts during the lunch period was an inappropriate topic for comment in a classroom setting.

In the future you will need to refrain from commenting on any items which might reflect negatively on individual members of our student body.

Eight months after his reinstatement, Miles filed this lawsuit claiming that the imposition of paid administrative leave and placement of the letter of reprimand in his file violated and "chilled" his free speech rights. After discovery, the parties filed cross-motions for summary judgment. The court granted summary judgment in favor of the school and denied Miles' motion.

## II. DISCUSSION

### A. Standard of Review

We review summary judgment orders de novo, using the same standards the district court applies. *Osgood v. State Farm Mut. Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). What material facts are relevant is determined by the substantive law governing a claim. Only factual disputes that affect the outcome of a case under governing law will preclude entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* That both parties have moved for summary judgment does not preclude a finding that a genuine issue of material fact exists. *Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir.1983).

### B. First Amendment Standard

In *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court established a test for determining whether an adverse employment decision violates a public employee's first amendment rights. This test requires that an employee show (1) the speech for which he was disciplined was constitutionally protected and (2) the protected speech motivated the adverse employment decision. After an employee has made these showings, the employer has the burden of showing by a preponderance of the evidence that she would have made the same decision absent the protected speech. *Id.* at 287, 97 S.Ct. at 576; *Kirkland v. Northside Indep. School Dist.*, 890 F.2d 794, 797, 799 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990).

In determining whether Miles has satisfied the initial burden of showing his classroom expression is constitutionally protected, we look to the Supreme Court's decision in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). In *Hazelwood*, student contributors to a newspaper published as part of a journalism class contested the principal's deletion of material from the newspaper prior to publication. *Id.* at 261, 108 S.Ct. at 564. Although the Court emphasized that "students in the public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" the Court held that educators do not offend the first amendment by exercising editorial control over school-sponsored expression "so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 266, 273, 108 S.Ct. at 567, 571 (quoting *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)). The Court explained that if school facilities have not been opened for " 'indiscriminate use by the general public' " and the school is not a public forum, then "school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Id.* at 267, 108 S.Ct. at 568 (quoting *Perry Educ. Ass'n v. Perry Local Edu-*

*cators' Ass'n,* 460 U.S. 37, 46 n. 7, 103 S.Ct. 948, 956 n. 7, 74 L.Ed.2d 794 (1983)).

In *Hazelwood,* the Supreme Court determined the extent to which classroom expression is constitutionally protected by first asking whether the school's student newspaper was a public forum. *Id.* at 266–70, 108 S.Ct. at 567–68. Similarly, our first inquiry is whether Miles' ninth-grade classroom is a public forum. As the Supreme Court pointed out in *Hazelwood,* "public schools do not possess all of the attributes of streets, parks, and other traditional public forums that, 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* at 267, 108 S.Ct. at 567–68 (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)). A podium before a captive audience of public school children is decisively different from a street corner soapbox. The Court in *Hazelwood* explained that a public forum is not created "'by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.'" *Id.* at 267, 108 S.Ct. at 568 (quoting *Cornelius v. NAACP Defense & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985)). If the creation and operation of a school newspaper as part of a journalism class can be devoid of an intent to open a classroom for public discourse, *id.* at 268–69, 108 S.Ct. at 568–69, then an ordinary classroom— such as the one in which Miles taught—is not a public forum. There is no evidence that school authorities intended to open Miles' government class for public discourse. Therefore, we conclude that the school "'reserved the forum for its intended purpose'" of teaching government. *Id.* at 270, 108 S.Ct. at 569 (quoting *Perry Educ. Ass'n,* 460 U.S. at 47, 103 S.Ct. at 955).

A recent Eleventh Circuit case supports this conclusion. In *Bishop v. Aronov,* 926 F.2d 1066 (11th Cir.1991), the Eleventh Circuit, addressing the extent to which a university may restrict a professor's classroom expression, explained that "[w]hile the [institution] may make its classrooms available for other purposes, we have no doubt that during instructional periods the ... classrooms are 'reserved for other intended purposes,' *viz.* the teaching of a particular ... course for credit." *Id.* at 1071 (quoting *Hazelwood,* 484 U.S. at 267, 108 S.Ct. at 568). Based on this analysis, the court in *Bishop* held the university classroom was not a public forum and the university could reasonably restrict a professor's classroom expression. *Id.* at 1071, 1077.

After determining that the student newspaper in *Hazelwood* was not a public forum, the Court focused on whether the students' expression was school-sponsored speech. *See id.* at 270–73, 108 S.Ct. at 569–71. The Court distinguished its earlier decision in *Tinker* from the facts at issue in *Hazelwood. Tinker* addressed whether the first amendment requires a school to tolerate particular student expression not sponsored by the school. *Hazelwood,* on the other hand, dealt with the authority of school officials "over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id.* at 271, 108 S.Ct. at 569. We are convinced that if students' expression in a school newspaper bears the imprimatur of the school, then a teacher's expression in the "traditional classroom setting" also bears the imprimatur of the school. *See id.* Based on the analysis in *Hazelwood,* we conclude Miles' expression during a ninth-grade government class must be treated as school-sponsored expression in a nonpublic forum for first amendment purposes. Accordingly, we will apply the *Hazelwood* standard for evaluating the actions of school officials related to the regulation of school-sponsored speech.

Both in the district court and on appeal, the parties have argued that the issue presented here is controlled by *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny. *See, e.g., Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138,

103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). This line of cases develops a test for balancing the interests of the state as employer in preventing the expression of some statements in the workplace against an employee's interest in making such statements. *See Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899; *see also Considine v. Board of County Comm'rs,* 910 F.2d 695, 698–99 (10th Cir.1990). In these cases, the courts have recognized that the state's interest as an employer in regulating employees' speech does not differ significantly from interests connected with the regulation of speech outside of the employment context. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. *Pickering* established a test that first asks whether a public employee's expression addresses a matter of public concern and then balances that employee's interest in making the statement with the interests of the government in "promoting the efficiency of the public services it performs." *Rankin,* 483 U.S. at 384–85, 388, 107 S.Ct. at 2897, 2899 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1735).

Although the *Pickering* test accounts for the state's interests as an employer, it does not address the significant interests of the state as educator. The Court in *Hazelwood* recognized that a state's regulation of speech in a public school setting is often justified by peculiar responsibilities the state bears in providing educational services: "to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Hazelwood,* 484 U.S. at 271, 108 S.Ct. at 570. These responsibilities warrant application of the standard adopted in *Hazelwood* for reviewing regulation of classroom speech rather than the *Pickering* standard for reviewing regulation of speech in a more general public setting. The concern addressed in *Pickering*—the right of an employee to participate as other citizens in debate on public matters—is simply less forceful when considered " 'in light of the special characteristics of the school environment.' " *Hazelwood,* 484 U.S. at 266, 108 S.Ct. at 567 (quoting *Tinker,* 393 U.S. at 506, 89 S.Ct. at 736); *see also* Note, *Public School Teachers and the First Amendment: Protecting the Right to Teach,* 65 N.Y.U.L.Rev. 693, 702–04 (1990) (because classroom environment is *sui generis,* public/private speech distinctions drawn in *Pickering* and progeny fail in context of teacher's classroom speech). Because of the special characteristics of a classroom environment, in applying *Hazelwood* instead of *Pickering* we distinguish between teachers' classroom expression and teachers' expression in other situations that would not reasonably be perceived as school-sponsored. *See Roberts v. Madigan,* 921 F.2d 1047, 1056–57 (10th Cir.1990), *petition for cert. filed,* No. 90–1448 (Mar. 15, 1991); *Bishop v. Aronov,* 926 F.2d 1066, 1071 (11th Cir.1991); *Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1176 (3d Cir.1990).

The primary distinction that could be made between the situation in *Hazelwood* and this case is that *Hazelwood* involved students' expression in a secondary school whereas here we are concerned with a secondary school teacher's classroom expression. In *Roberts,* 921 F.2d at 1056–57, we reviewed a school's regulation of a fifth grade teacher's speech. School officials alleged the teacher's speech caused a violation of the first amendment's Establishment Clause. We held there was no reason to distinguish "between students and teachers where classroom discussion is concerned." 921 F.2d at 1057. As in *Roberts,* we find no reason to distinguish between the classroom discussion of students and teachers in applying *Hazelwood* here. A school's interests in regulating classroom speech—such as "assur[ing] that participants learn whatever lessons the activity is designed to teach" and that students are not "exposed to material that may be inappropriate for their level of maturity" (*Hazelwood,* 484 U.S. at 271, 108 S.Ct. at 570)—are implicated regardless of whether that speech comes from a teacher or student.

### C. Application of the Standard

#### 1. *Legitimate Pedagogical Interests*

In *Hazelwood,* the Court found that the school's decision to excise two pages from the newspaper reasonably protected pedagogical interests. The Court noted that these pedagogical interests included preventing speech that was not sufficiently sensitive to students' privacy interests or that was inappropriate for the maturity level of the adolescent audience. 484 U.S. at 274, 108 S.Ct. at 571. The school here proffers several interests to justify its sanction of Miles' remark. First, the school states an interest in preventing Miles from using his position of authority to confirm an unsubstantiated rumor. The Supreme Court already has recognized a school's interest in disassociating itself from speech the school reasonably considers inappropriate to bear its imprimatur. *Id.* at 260, 108 S.Ct. at 564.

Second, the school asserts an interest in ensuring that teacher employees exhibit professionalism and sound judgment. In *Koch v. City of Hutchinson,* 847 F.2d 1436, 1450 (10th Cir.) (en banc), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988), we recognized a public employer's interest in ensuring its employee's "ability and competence to perform his or her job." Clearly, professionalism and sound judgment contribute to the competent performance of a teacher's job. Indeed, as Miles himself reminds us,

> The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers ... demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class.

Third, the school states an interest in providing an educational atmosphere where teachers do not make statements about students that embarrass those students among their peers. This interest is related to two concerns the Court approved in *Hazelwood.* There, the Court held a school

could regulate school-sponsored speech to protect the privacy interests of unnamed but potentially identifiable parties mentioned in the article. 484 U.S. at 274–75, 108 S.Ct. at 571–72. The Court also permitted school officials to prevent the publication of allegations against named parties without giving them a fair chance to refute the allegations. *Id.* at 275, 108 S.Ct. at 572.

The interests asserted by the school in this case clearly are legitimate pedagogical interests. Thus, the only remaining question under *Hazelwood* is whether the actions taken by the school are reasonably related to legitimate pedagogical interests.

#### 2. *The Relation of the School's Actions to Pedagogical Interests*

The school in this case put Miles on paid administrative leave during the investigation and placed a letter of reprimand in his file. The brief administrative leave allowed the school to investigate the incident and to disassociate itself from the speech; thus, the leave was directly tied to the interest of avoiding the appearance that the comment was sponsored by the school or in any way reflected the views of the school administration. The letter of reprimand stated only that Miles should refrain from the same kinds of comments as those involved in the incident. The letter was specific in articulating the school's interest: it admonished a teacher to refrain from commenting on items that would reflect negatively on individual members of the student body. That portion of the reprimand—particularly when viewed in the context of the incident for which Miles knew he was being reprimanded—serves the precise legitimate pedagogical interests articulated by the school. We hold that the school acted reasonably under the circumstances of this case where the actions taken were directly related to the school's legitimate pedagogical interests.

Miles' argument regarding the vagueness and overbreadth of the reprimand invites us to tailor the language or to pick an appropriate action for the school. We decline to do so. Having found that the

school had legitimate pedagogical interests and that the actions taken were reasonably related to those interests, we will not interfere with the authority of the school officials to select among alternative forms of discipline. We will protect appropriate constitutional interests. We should not and will not run the schools.

### 3. *Immaterial Facts*

Miles argues that factual disputes remain regarding whether he named the student, whether the rumor about the alleged incident was true, whether the incident was generally known in the school, and whether other students knew who the participants were. Miles' argument is without merit. The factual issues Miles raises are not material under the *Hazelwood* standard. *See Hazelwood*, 484 U.S. at 273, 108 S.Ct. at 571. Therefore summary judgment is appropriate based on *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### D. Academic Freedom

■ Finally, Miles contends the school's actions violate his first amendment academic freedom rights. The Supreme Court has recognized a university's institutional right to academic freedom. *See, e.g., Regents of Univ. of California v. Bakke*, 438 U.S. 265, 311–12, 98 S.Ct. 2733, 2759–60, 57 L.Ed.2d 750 (1978) (citing *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)). At least one lower court has recognized an individual right to academic freedom under limited circumstances in the university setting. *See Parate v. Isibor*, 868 F.2d 821, 830–31 (6th Cir.1989) (university professor's right of academic freedom not violated because the dean's interference did not cast "pall of orthodoxy" over professor's classroom expression). However, the caselaw does not support Miles' position that a secondary school teacher has a constitutional right to academic freedom. *See Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 920, 102 S.Ct.

2799, 2835, 73 L.Ed.2d 435 (1982) (Rehnquist, J., dissenting) (state as educator subject to fewer strictures when regulating speech in primary and secondary schools than university; school officials may determine that particular subject is not suitable for education of secondary school children); *Adams v. Campbell City School Dist.*, 511 F.2d 1242, 1247 (10th Cir.1975) (teacher does not have "unlimited liberty as to structure and content of the courses, at least at the secondary level"); *see also Bishop*, 926 F.2d at 1075 (finding no support for individual academic freedom right of university professor); Byrne, *Academic Freedom: A "Special Concern of the First Amendment"*, 99 Yale L.J. 251, 255 (1989) ("constitutional academic freedom should primarily insulate the university in core academic affairs from interference from the state"). The school's mild restrictions of Miles' classroom expression here simply do not threaten to "cast a pall of orthodoxy over the classroom." *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). We find no merit in the argument that Miles has a constitutional right—based on academic freedom or something else—that protects his substantiation of a rumor in a classroom setting.

### III. CONCLUSION

The school has identified legitimate educational interests it sought to protect and has shown that its actions are reasonably related to those interests. Miles has failed to raise a genuine factual dispute on either of these issues. Because Miles has not shown his classroom comments under these particular circumstances were constitutionally protected, we do not reach the other two requirements under *Mount Healthy*. We AFFIRM.