TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

| | |
|---|---|
| OPINION : | |
| : | No. 93-1201 |
| of : | |
| : | March 17, 1994 |
| DANIEL E. LUNGREN : | |
| Attorney General : | |
| : | |
| GREGORY L. GONOT : | |
| Deputy Attorney General : | |
| : | |

THE HONORABLE MIKE THOMPSON, MEMBER OF THE CALIFORNIA SENATE, has requested an opinion on the following question:

May a school district prohibit its elementary school teachers from wearing buttons expressing political opinions on statewide ballot measures during classroom periods?

CONCLUSION

A school district may prohibit its elementary school teachers from wearing buttons expressing political opinions on statewide ballot measures during classroom periods.

ANALYSIS

The question presented for resolution concerns the wearing of political campaign buttons by elementary school teachers while they are engaged in classroom teaching duties. We are asked, in effect, to determine the statutory and constitutional limitations placed upon a local school district in prohibiting such conduct. We assume for purposes of our analysis that wearing a campaign button constitutes both political activity and expressive conduct which concerns an issue of general public interest.[1] In these circumstances the political activity would be inseparable from the speech element.

_____

[1]In so doing, we accord this conduct the benefit of both the federal and state Constitutions and the Education Code provisions which serve to protect the political rights of school employees.

The relevant statutory scheme applicable to our discussion is set forth at Education Code sections 7050-7057.[2] These provisions govern the political activities of school officials and employees. As stated in section 7050, "[t]he Legislature finds that political activities of school employees are of significant statewide concern" and that "[t]he provisions of this article [§§ 7050-7057] shall supersede all provisions on this subject in any city, county, or city and county charter as well as in the general law of this state." Section 7052 establishes the general prohibition against restricting the political rights of school employees:

"Except as otherwise provided in this article, or as necessary to meet requirements of federal law as it pertains to a particular employee or employees, no restriction shall be placed on the political activities of any officer or employee of a local agency."[3]

Section 7055 specifically authorizes the placement of restrictions in two situations:

"The governing body of each local agency may establish rules and regulations on the following:

"(a) Officers and employees engaging in political activity during working hours.

"(b) Political activities on the premises of the local agency."

Thus, the Education Code allows the political activities of a school teacher to be restricted only to the extent that they occur during working hours or on school premises, and such restriction must be pursuant to a duly adopted rule or regulation.

Since freedom of speech rights are implicated in the activity here in question, we must determine whether regulation or prohibition by a school district pursuant to the terms of section 7055 would be consistent with the United States and California Constitutions. The First Amendment of the United States Constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ." This restriction against the exercise of federal power is applicable to state and local governments by virtue of the due process clause of the Fourteenth Amendment. (See *Lee* v. *Weisman* (1992) 505 U.S. __ [120 L.Ed.2d 467, 480-481].)

Article I, section 2, subdivision (a) of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." While the California Constitution has been held to afford greater protection than the First Amendment (*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908), the "power to impose . . . restrictions on [expressive] activity is nonetheless measured by federal constitutional standards" (*Savage* v. *Trammell Crow Co., Inc.* (1990) 223 Cal.App.3d 1562, 1572-1573; see *U.C. Nuclear Weapons Labs*

_____

[2]All section references hereafter are to the Education Code.

[3]The clause concerning the requirements of federal law pertains to positions for which federal funds are obtained. However, we are informed that in making funds available to local school districts, the practice of the federal government has been to waive any applicable federal restrictions. "Local agency" is defined in section 7051 to include "an elementary, high, or unified school district . . . ."

*Conversion Project* v. *Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157, 1164-1165). Because we believe that the results would be the same under both the federal and state Constitutions (see, e.g., *DiBona* v. *Matthews* (1990) 220 Cal.App.3d 1329, 1346), we will limit our discussion to the First Amendment and cases interpreting its provisions.

In *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, the United States Supreme Court stated the following basic rule concerning First Amendment expressive activity occurring on school grounds:

"First Amendment rights, applied in light of the special characteristics of the school environment are available to teachers and students. It can hardly be said that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. . . .

". . . On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. . . ." (*Id.,* at pp. 506-507.)

*Tinker* concerned a disciplinary action taken by a school district against high school students who wore black armbands to school as a means of expressing their objections to the United States' involvement in the Vietnam War. The students' action was described by the court as "a silent, passive expression of opinion," which did not entail "speech or action that intrudes upon the work of the schools or the rights of other students." (*Id.,* at p. 508.) The school authorities' "undifferentiated fear or apprehension" of a disturbance from the wearing of the armbands was not deemed sufficient by the court to overcome the students' right to freedom of expression. "Certainly where there is no finding and no showing that engaging in the forbidden conduct would `materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained. [Citation.]" (*Id.,* at p. 509.) The court found relevant the fact that the school district "did not purport to prohibit the wearing of all symbols of political or controversial significance." (*Id.,* at p. 510.) It noted that "students in some of the schools wore buttons relating to national political campaigns" without interference by the district. (*Ibid.*)

More recently in *Hazelwood School District* v. *Kuhlmeier* (1987) 484 U.S. 260, the court considered the constitutionality of a high school principal's ban on the printing of certain student articles in a school newspaper. Citing *Tinker,* the *Hazelwood* court reiterated the principle that students "cannot be punished merely for expressing their personal views on the school premises -- whether `in the cafeteria, or on the playing field, or on the campus during the authorized hours,' [citation] -- unless school authorities have reason to believe that such expression will `substantially interfere with the work of the school, or impinge on the rights of other students' [citation]." (*Id.,* at p. 266.) The court limited, however, the scope of that principle as follows:

"We have nonetheless recognized that the First Amendment rights of students in the public schools `are not automatically coextensive with the rights of adults in other settings,' [citation] and must be `applied in light of the special characteristics of the school environment.' [Citations.] A school need not tolerate student speech that is inconsistent with its `basic educational mission,' [citation], even though the government could not censor similar speech outside the school. Accordingly, we held in *Fraser* that a student could be disciplined for having delivered a speech that was `sexually explicit' but not legally obscene at an official school assembly, because the school was entitled to `disassociate itself' from the speech in a manner that would

demonstrate to others that such vulgarity is `wholly inconsistent with the "fundamental values" of public school education.' [Citation.] We thus recognized that `[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,' [citation] rather than with the federal courts. It is in this context that respondents' First Amendment claims must be considered." (*Id.,* at pp. 266-267.)

The court found that because a public forum had not been created under the facts of the case, the "school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." (*Id.,* at p. 267.) The court noted that in contrast to *Tinker,* where the question was whether a school must *tolerate* particular student or teacher speech, the question in the case before it was whether the school must *promote* such speech. When student expression occurs in the context of an activity which "students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" (*ibid.*), the standard to be applied is as follows:

> "Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school. Hence a school may . . . `disassociate itself' [citation] not only from speech that would `substantially interfere with [its] work . . . or impinge upon the rights of other students,' [citation], but also from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences. . . . A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived . . . to associate the school with any position other than neutrality on matters of political controversy. . . ." (*Id.,* at pp. 271-272; fn. omitted.)

Accordingly, the court held:

> ". . . [T]he standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression. Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." (*Id.,* at pp. 272-273; fns. omitted.)

While *Hazelwood* involved student rather than teacher expression, the court included teachers among those to whom its test would be applicable (*id.,* at p. 267), and several federal circuit courts, discussed below, have applied its test to teachers' *classroom* speech.

In *Miles* v. *Denver Public Schools* (10th Cir. 1991) 944 F.2d 773, the Tenth Circuit applied the *Hazelwood* analysis to classroom remarks of a ninth-grade teacher that tended to confirm an unsubstantiated and embarrassing rumor about certain students' extracurricular conduct. It first determined that the classroom was not a public forum, noting that "[a] podium before a captive audience of public school children is decisively different from a street corner soapbox." (*Id.,* at p. 776.) Making a comparison with *Hazelwood,* the court then stated: ". . . We are convinced that if students' expression in a school newspaper bears the imprimatur of the school, then a teacher's

expression in the `traditional classroom setting' also bears the imprimatur of the school. [Citation.]" (*Ibid.*)

Similarly, in *Bishop* v. *Aronov* (11th Cir. 1991) 926 F.2d 1066, the court held that a university could reasonably restrict the classroom expression of religious bias by a university professor. It relied upon another court's decision which upheld a school district's authority to prevent a teacher from silently advertising his religious convictions while in the classroom:

"The Tenth Circuit has recently decided a more factually similar case that instructively relies on *Tinker* to evaluate a school's decision to require a fifth-grade teacher to remove certain texts from his classroom library and to refrain from silently reading the Bible during an in-class reading time. [Citation.] However, the real foundation for our Sister Circuit's conclusion seems to be [*Hazelwood*]. Thereunder, the Tenth Circuit found support for restriction of a teacher's activity where `the [teacher's] conduct endorses a particular religion and is an activity "that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school[.]"' [Citation.] . . . .

". . . While a student's expression can be more readily identified as a thing independent of the school, a teacher's speech can be taken as directly and deliberately representative of the school. Hence, where the in-class speech of a teacher is concerned, the school has an interest not only in preventing interference with the day-to-day operation of its classrooms as in *Tinker*, but also in scrutinizing expressions that `the public might reasonably perceive to bear [its] imprimatur[.]' [Citation.]" (*Id.,* at p. 1073.)

Most recently, in *Ward* v. *Hickey* (1st Cir. 1993) 996 F.2d 448, the court explained the standard to be applied to a teacher's classroom expressions:

"We begin with the proposition that teachers retain their First Amendment right to free speech in school. [Citation.] On the other hand, it is well settled that public schools may limit classroom speech to promote educational goals. [Citation.] Courts have long recognized the need for public school officials to assure that their students `learn whatever lessons [an] activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.' [Citation.]

"In light of these competing principles we find that a school committee may regulate a teacher's classroom speech if: (1) the regulation is reasonably related to a legitimate pedagogical concern, [citation]; and (2) the school provided the teacher with notice of what conduct was prohibited [citation].

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . a teacher's classroom speech is part of the curriculum. Indeed, a teacher's principal classroom role is to teach students the school curriculum. Thus, schools may reasonably limit teachers' speech in that setting. [Citation.]

". . . It stands to reason that whether a regulation is reasonably related to legitimate pedagogical concerns will depend on, among other things, the age and

sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation." (*Id.*, at pp. 452-453.)

While the facts in *Hazelwood* and its progeny differ from those involved in the present inquiry, we believe that the principles enunciated therein are applicable to elementary school teachers and their classroom expression of political partisanship. First, as previously noted, the United States Supreme Court has specifically mentioned teachers as being among those whose speech may reasonably be restricted in school buildings and areas which are not public forums (*Hazelwood School District* v. *Kuhlmeier, supra*, 484 U.S. at 267.) An elementary school classroom is not a public forum. (*DeNooyer by DeNooyer* v. *Livonia Public Schools* (E.D.Mich. 1992) 799 F.Supp. 744, 749; *Quappe* v. *Endry* (S.D.Ohio 1991) 772 F.Supp. 1004, 1008, affd. 979 F.2d 851.) Second, the court has specifically referred to the right of school authorities to refuse to sponsor speech that might reasonably be perceived as associating the school with any position other than neutrality on matters of political controversy. (*Hazelwood School District* v. *Kuhlmeier, supra*, 484 U.S. at 272.)

Here, the teachers would be engaged in an expressive activity during classroom periods and espousing a non-neutral position relative to a matter of political controversy.[4] We have little difficulty in concluding that the wearing of a political campaign button in such circumstances might reasonably be perceived as bearing the imprimatur of the school district and thus subject to prohibition by school authorities.

In reaching this conclusion, we find the *Hazelwood* analysis to be more appropriate for application to these facts than the analysis set forth in *Pickering* v. *Board of Education* (1968) 391 U.S. 563. *Pickering*, which involved a teacher's statements that were "in no way directed toward any person with whom [the teacher] would normally be in contact in the course of his daily work" (*id.*, at p. 569), established a test that balanced "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" (*id.*, at p. 568). We agree with the court in *Miles* v. *Denver Public Schools, supra*, 944 F.2d 773, that:

"Although the *Pickering* test accounts for the state's interests as an employer, it does not address the significant interest of the state as educator. . . . The concern addressed in *Pickering* -- the right of an employee to participate as other citizens in debate on public matters -- is simply less forceful when considered `"in light of the special characteristics of the school environment."' [Citations.] Because of the special characteristics of a classroom environment, in applying *Hazelwood* instead of *Pickering* we distinguish between teachers' classroom expression and teachers' expression in other situations that would not reasonably be perceived as school-sponsored. [Citations.]" (*Id.*, at p. 777.)

Finally, in accordance with the *Hazelwood* standard, we must determine whether the prohibition under consideration here is "reasonably related to legitimate pedagogical concerns." (*Hazelwood School District* v. *Kuhlmeier, supra,* 484 U.S. at 273.) It may be argued that the mere act of wearing a political campaign button during an instructional period does not interfere with the

---

[4]Although the expression of political partisanship here is a passive one, we assume that it is explicit and on display at all times during the classroom periods. Since *Tinker* does not govern the resolution of this inquiry, the lack of overt classroom disruption is not an issue.

educational responsibilities of the school to any significant degree, even if the wearer is the teacher. However, the *Hazelwood* court indicated that school officials are entitled to exercise control over classroom speech not only to ensure that knowledge is adequately imparted, but also to protect students from material inappropriate for their level of maturity and to protect the educational institution from the perception that it is fostering inappropriate indoctrination. Here, the two latter concerns are raised when a teacher wears a campaign button in front of a captive audience of elementary school children. Such children might confuse such expressed personal views with the subject matter of their classroom curriculum. Parents may legitimately question whether the teacher is attempting to use his or her position of authority to influence the children concerning the political issue in question.

Accordingly, we conclude that a school district may prohibit its elementary school teachers from wearing buttons expressing political opinions on statewide ballot measures during classroom periods. A district would have a legitimate pedagogical interest in preventing its students from viewing political material they may not understand and in protecting itself against a perception that its classrooms are being used for partisan political advantage. Such a restriction upon the teachers' First Amendment rights would be permissible if set forth in a regulation or rule adopted pursuant to the terms of section 7055.

* * * * *