**Diane MURRAY, Plaintiff,**

v.

**PITTSBURGH BOARD OF PUBLIC EDUCATION, Lee B. Nicklos, individually and in her capacity as Director of Human Resources, and William Nicholson, individually and in his capacity as a Principal of Letsche Education Center, Defendants.**

**Civil Action No. 94–2157.**

United States District Court, W.D. Pennsylvania.

March 25, 1996.

Edward A. Olds, Pittsburgh, PA, for Diane Murray.

Vicki L. Beatty, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, PA, for Pittsburgh Board of Public Education, Lee B. Nicklos.

*MEMORANDUM*

LANCASTER, District Judge.

This action arises under the Civil Rights Act of 1871, 42 U.S.C. § 1983. Plaintiff, Diane Murray, is a high school English teacher employed by the Pittsburgh Board of Public Education. She challenges a school policy that prohibits her from using a classroom management technique called "Learnball"; organizing an after-school activity called a "Learnball Superbowl"; and displaying Learnball symbols, literature, and related paraphernalia in her classroom. Plaintiff seeks a declaratory judgment that the policy constitutes an unconstitutional restraint of free speech in violation of the First and Fourteenth Amendments to the United States Constitution. She also seeks permanent injunctive relief.

The matter was tried without a jury on February 13, 14, and 16, 1996. For the reasons that follow, the court finds that defendants' policy does not violate plaintiff's constitutionally protected right to free speech, and accordingly, the court will enter

judgment in favor of defendants and against plaintiff.

## I.

In accordance with Fed.R.Civ.P. 52, the following constitutes the findings by the court. Additional findings will be discussed throughout this memorandum in context.

Plaintiff is a tenured high school English teacher employed by the Pittsburgh Board of Public Education ("Board") and assigned to Letsche Alternative Learning Center ("Letsche" or "School"). Letsche is an alternative high school that provides instruction for at-risk students who have had trouble at their home schools or who have had legal problems. Letsche also has a program for pregnant students.

Plaintiff is a proponent of a classroom management technique known as Learnball. Learnball is organized along a sports format. It requires a styrofoam ball and a plastic backboard and hoop, which are marked with the Learnball-registered logo. Students divide into teams, elect team leaders, and compete for points which are awarded for such things as coming to class on time, completing assignments on time, and scoring baskets. Students who perform well academically and obey class rules are rewarded with Learnball merit certificates, are permitted to play a radio in the classroom, and are permitted to shoot baskets in the classroom. Learnball can also involve an activity called a "Learnball Superbowl." This is an after-school activity organized along the Learnball format that involves teams which compete against each other as in the classroom. It also involves talent shows and other displays of student talent.

Learnball is purely a motivational technique; it does not affect the manner in which a teacher presents course material. Learnball strategies, such as playing the radio, shooting baskets, winning merit certificates, and scoring points, are used solely to motivate students and do not alter the way in which the students are instructed.

Teachers who want to utilize the Learnball technique must become members of the "Learnball League International" of which plaintiff is an officer. Membership requires a fee of approximately $85 to cover the cost of Learnball materials, such as the Learnball Handbook and other literature and an adhesive Learnball-registered logo. The Learnball League International directs member teachers to participating toy stores that sell the required hoop and foam ball. Teachers are not authorized to use the Learnball technique without becoming members of the Learnball League International, without the required hoop and ball, or without the handbook and accompanying literature. The only teacher in the Pittsburgh Public School District who is currently a member of the Learnball League International is plaintiff, and no other teacher has approached the Superintendent of Pittsburgh Public Schools about using Learnball.

Plaintiff began using Learnball at Letsche in 1976. Shortly before the start of the 1988 school year, however, Mr. Vernon Phillips, who was then Principal of Letsche, notified plaintiff that effective the first day of the school year she could no longer use Learnball in her classes. He stated that the Board did not approve of Learnball and that in his opinion Learnball did not benefit the students.

In response to Mr. Phillips's directive, plaintiff filed suit in this court—similar to the instant suit—to enjoin the Board and numerous school officials from prohibiting her use of Learnball. Additionally, she filed a union grievance under the collective bargaining agreement. The end result of this prior round of litigation was that plaintiff was prohibited from using the Learnball technique in the classroom.

In August 1994, for reasons that are unclear, plaintiff formed the belief that she had permission to resume Learnball. Plaintiff began using Learnball in her classes without informing the new school principal, Dr. William Nicholson, that she intended to use Learnball and without receiving his permission to use Learnball. At the same time, plaintiff began discussing with students and faculty the possibility of organizing an after-school Learnball Superbowl. In addition, she began organizing small, daily Learnball

contests in her classroom in preparation for the after-school event.

Sometime thereafter, Dr. Nicholson observed a student in plaintiff's classroom reading aloud from a Learnball teaching manual. He also observed a Learnball hoop and styrofoam ball in plaintiff's classroom, as well as other Learnball literature, symbols, and paraphernalia. That same day, Dr. Nicholson told plaintiff that he would not allow Learnball to be used as a motivational strategy at Letsche. He ordered her to remove from the School building all Learnball literature and equipment, including basketballs, goals, and backboards.

In addition, Dr. Nicholson told plaintiff that, for reasons similar to those that underlay his decision to prohibit Learnball as a classroom management technique, he would not authorize a Learnball Superbowl as a school-sponsored, after-school activity. Dr. Nicholson did, however, inform plaintiff that she could apply to the Board's Executive Director of Business Affairs for an after-school building permit to use the School to stage a Learnball Superbowl as a privately sponsored event, not affiliated with the School. Plaintiff did not file an application for a building permit. Instead, she filed this lawsuit.

## II.

### A.

Plaintiff contends that because teachers at Letsche are encouraged to decorate their classrooms with inspirational newspaper articles, quotations, pictures, art work, and students' work, the classroom is a "designated open public forum." Plaintiff contends, therefore, that she has a First Amendment right to, among other things, use the Learnball motivational technique in her classroom, to display Learnball symbols and literature in her classroom, to use articles she authored on Learnball to instruct students in writing, and to use class time to advocate for Learnball and generate enthusiasm for it. According to plaintiff, these activities constitute constitutionally protected speech the regulation of which must pass strict scrutiny.

We reject plaintiff's argument and hold that the classrooms at Letsche are nonpublic fora, and the School's restriction on plaintiff's speech need only be reasonable. The court further finds that under the facts of the case, the School's policy is reasonable and does not violate plaintiff's First Amendment rights.

### B.

The government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully intended. *Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). This includes the power to limit an individual's use of the property as a forum for expressive speech. When the government restricts expressive speech, the validity of the restriction depends on whether the relevant forum is determined to be a "traditional public forum," a "designated open public forum," or a "nonpublic forum." *Gregoire v. Centennial Sch. Dist.,* 907 F.2d 1366, 1370 (3d Cir.1990).

A traditional public forum is defined in terms of places such as streets, sidewalks, or parks, which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). When the government restricts speech in a traditional public forum, the restriction must survive strict scrutiny analysis. *Gregoire,* 907 F.2d at 1370. Strict scrutiny dictates that the government can restrict expressive speech only if the restriction is necessary to serve a compelling state interest and is narrowly drawn to achieve that interest. *Id.; see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1982).

A designated open public forum is created when "public property is intentionally opened ... for indiscriminate use by the public as a place for expressive activity." *Gregoire,* 907 F.2d at 1370. When the government restricts speech in a designated

open public forum, like in a traditional public forum, it must pass strict scrutiny analysis. *Id.*

■■■ A nonpublic forum exists when government-owned property has not been dedicated to indiscriminate expressive activity by the general public. *Gregoire,* 907 F.2d at 1370–71 (citation omitted). The government may restrict speech in a nonpublic forum "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because the public officials oppose the speaker's view.'" *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448 (quoting *Perry,* 460 U.S. at 46, 103 S.Ct. at 955).

■■ Plaintiff does not contend that her classroom at Letsche is a traditional public forum; rather, she contends that it is a designated open public forum. Plaintiff, however, has failed to produce any credible evidence that the School intended to open or actually has opened the classrooms at Letsche for indiscriminate use by the public as a place for expressive speech, nor has plaintiff directed the court to a single case in which a public high school classroom was determined to be a designated open public forum. This is not surprising as it is simply not the law.

The court finds meritless plaintiff's suggestion that by encouraging teachers to decorate their classrooms in the manner in which public school classrooms have historically and customarily been decorated by teachers, Letsche has expressed an intention to open classrooms to the indiscriminate expressive speech of the public.

■■■ Similarly, we do not find merit in plaintiff's alternate suggestion that Letsche has opened its classrooms for the purpose of creating "limited public fora" for the expressive speech of teachers. A limited public forum " 'is created when government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.'" *Kreimer v. Bureau of Police for Town of Morristown,* 958 F.2d 1242, 1261 (3d Cir.1992) (quoting *Travis v. Owego–Apalachin Sch. Dist.,* 927 F.2d 688 (2d Cir.1992)). Again, plaintiff argues that because the School permits teach-

ers to decorate their classrooms with many different kinds of materials, it intended to create in the classroom a limited public forum for the expressive speech of teachers. Thus, according to plaintiff, even if she is not entitled to use Learnball as a classroom management technique, she nonetheless is entitled to display Learnball symbols and literature.

Plaintiff's argument, however, lacks a credible factual basis. We find that the School did not intend to open, and has not actually opened, its classrooms to the indiscriminate display of anything that a teacher might regard as inspirational to the students. Dr. Nicholson, as principal of Letsche, has ultimate authority over what is displayed in the classroom. The court finds credible his testimony that any materials that are not related to the School's curriculum, or are otherwise pedagogically inappropriate for the classroom, are removed from display.

Therefore, we find that merely because Letsche has permitted its teachers to decorate their classrooms in the manner that public school classrooms have historically and customarily been decorated by teachers, Letsche has not manifested an intention to create in its classrooms limited public fora for the expressive speech of teachers.

## C.

■■■ A public high school classroom is a nonpublic forum. *See Miles v. Denver Pub. Schs.,* 944 F.2d 773, 776 (10th Cir.1991) (citing *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 267–69, 108 S.Ct. 562, 567–69, 98 L.Ed.2d 592 (1988)). As such, a school may restrict the use of its classrooms to serve the school's intended educational purposes as long the restrictions are reasonable and are not an effort to suppress a teacher's expression merely because the school opposes his particular views. A school's interest in controlling its curriculum is encompassed within the educational purposes of the classroom. *Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1176–77 (1990). Consequently, a teacher's First Amendment rights do not extend to choosing classroom management techniques. *Id.* Thus, defendants' restriction on plaintiff's speech in the classroom

is permissible if it is reasonable in light of Letsche's curricular objectives and does not represent viewpoint discrimination.

■ In this case, the credible evidence shows that in the Pittsburgh Public School District each school's principal has the authority to make all of the school's administrative and educational decisions as long as his decisions do not conflict with a Board policy or rule. Like his predecessor, Dr. Nicholson prohibited the use of Learnball in the classroom at Letsche. His basis for this policy is credible, detailed, and well-reasoned.

Specifically, Dr. Nicholson testified that he does not support Learnball for a number of reasons: The Board does not endorse Learnball as part of the English curriculum; there has been no training of teachers in the Learnball technique; there is no empirical evidence that Learnball is an effective method for increasing students' academic potential; Learnball is inappropriate for students of high school age—specifically, the level of questioning utilized in Learnball is not challenging to high school students because it does not force them to make evaluations and judgments; as a motivational rather than instructional technique Learnball diverts too much class time away from actual instruction and is therefore especially inappropriate for at-risk students who should be spending all of class time on instruction; improving students' basket-shooting abilities does not enhance their opportunities for attaining employment or college admission; and, there have been complaints from African–American parents, whose children comprise 86% of the Letsche student body, that Learnball stigmatizes African–American students because it suggests they can be motivated to learn only by using basketball techniques in the classroom.

Dr. Nicholson's reasons amply satisfy the requirement that a school's restriction on a teacher's classroom speech be reasonable in light of the purpose of the forum—the purpose in this case being the education of at-risk high school students. Furthermore, there is no credible evidence in the record to suggest that the School's ban on Learnball is an attempt to stifle plaintiff's point of view in particular. Rather, the credible evidence shows that with its ban on Learnball, the School intended to promote the techniques it has determined are best suited to teaching the fundamentals of high school English to at-risk high school students.

Moreover, Learnball materials might also be banned from display in the classroom for the same reasons that the motivational technique itself is banned. The credible evidence establishes that motivational symbols such as the Learnball hoop, ball, merit certificate, and literature cannot be separated from the Learnball motivational technique itself. According to the Learnball League International, the hoop, ball, and literature are required implements of the Learnball technique. Therefore, just as the Learnball technique can be legitimately banned from the classroom, so can the hoop, ball, and literature, as they are intimately associated with the Learnball motivational strategy.

In summary, the classrooms at Letsche are nonpublic fora, their intended purpose being the teaching of the School-approved curriculum to at-risk high school students. Accordingly, plaintiff has no First Amendment right to use the Learnball motivational technique in her classroom, to use class time to instruct students in the Learnball technique, to display Learnball literature, logos, and symbols (such as the hoop, ball, and merit certificates) in her classroom, or to use class time to advocate for the value of Learnball techniques and create student enthusiasm for it.[1]

### D.

■ We next address plaintiff's claim that the School has violated her free speech

---

**1.** Plaintiff claims that the School prohibited her from discussing Learnball with teachers outside of class in violation of her First Amendment rights. There is no credible evidence in the record that defendants ever banned such conduct.

Plaintiff has also charged Dr. Nicholson with retaliation for exercise of her First Amendment

right to free speech. Specifically, she alleged that the ban on Learnball was an act of retaliation against her. There is no credible evidence in the record that supports plaintiff's claim. In fact, plaintiff did not raise the issue of retaliation at trial, much less present evidence that would support such a claim.

rights by denying her the use of the Letsche facility for an after-school activity called "Learnball Superbowl." In support of her claim, plaintiff contends that the School has a constitutional obligation to designate a Learnball Superbowl as a school-sponsored activity. Plaintiff is somewhat unfocused as to how, in denying her request that it sponsor a Learnball Superbowl, the School has violated the Constitution. Nevertheless, assuming that a Learnball Superbowl is protected speech rather than nonexpressive conduct, plaintiff's claim is not supported in the law or the facts.

There are two broad categories of after-school activities that take place in Pittsburgh public school buildings: school-sponsored activities and nonschool-sponsored activities. School-sponsored activities are those related to the school's curriculum, such as the "Spanish Club," or extra-curricular activities, such as varsity sports. School-sponsored groups must apply to the school's principal for a building permit. Nonschool-sponsored groups, such as the Boy Scouts, may also use school buildings. However, the building principal does not have the authority to grant or deny the application. That authority lies with the Board's Executive Director of Business Affairs, and nonschool-sponsored groups must apply directly to him for a permit to use the school after-hours.

The record shows that each school principal has the authority to determine which activities his school will sponsor. Like classroom activities, the principal may restrict school-sponsored, after-school activities to those that are pedagogically appropriate for the school's students. For the reasons discussed earlier, Dr. Nicholson has determined that the Learnball technique is inappropriate for Letsche's at-risk students. Consequently, the court finds that the School has not violated plaintiff's First Amendment rights by refusing to sponsor a Learnball Superbowl as an after-school activity.

■ As far as using the School for a nonschool-sponsored Learnball Superbowl, plaintiff has not applied to the Executive Director of Business Affairs for the required permit. Plaintiff suggests, however, that the School has effectively denied her such a permit when it refused to sponsor a Learnball Superbowl. Specifically, plaintiff reasons that unless she can use the hallways of the School to post notices about a Learnball Superbowl or use class time to prepare the students for the event, she would be unable to generate interest in an after-school Learnball Superbowl. Thus, any permit she might obtain for the nonschool-sponsored event would be useless.

No doubt there is some truth to plaintiff's concern; however, not even plaintiff suggests that the First Amendment requires the School to allow her, as a private citizen, to use class time in order to interest students in a nonschool-sponsored activity or to teach students the skills needed to participate in that activity.

Moreover, plaintiff does not have a First Amendment right to use Letsche's hallways to generate interest in a nonschool-sponsored Learnball Superbowl. The credible evidence indicates that the School has not, either by its policies or its actual practices, opened its hallways to the indiscriminate use by the public for the advertisement of non-school sponsored or community activities. On the contrary, the court finds from the credible testimony that the School permits posting notices in the hallways for School-sponsored activities only. To the extent that plaintiff testified otherwise, we do not find her testimony credible.

Therefore, Letsche's hallways, like its classrooms, are not public fora, but rather, the School's policies and practices indicate that the School's hallways are restricted to the purpose of allowing teachers and administrators to post notices for School-sponsored activities only. Thus, in the event the Board's Executive Director of Business Affairs, upon application, grants plaintiff access to Letsche for an after-school, nonschool-sponsored Learnball Superbowl, the School is not constitutionally required also to grant plaintiff access to its classrooms, or its hallways, to insure that the after-school activity is a success.

### E.

■ Finally, plaintiff argues, in a generalized fashion, that defendants' Learnball

policy denies her the equal protection of the laws. This claim is equally without merit.

Reduced to its fundamentals, the Equal Protection clause is a "direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). An equal protection analysis is called for, however, only if the challenged government action classifies or distinguishes between two or more distinct groups. In other words, equal protection only affords an individual protection against intentional discrimination that is based upon class membership. A person who brings an action under the Equal Protection clause "must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual." *Huebschen v. Department of Health & Social Serv.,* 716 F.2d 1167, 1171 (7th Cir.1983); *Handley v. Phillips,* 715 F.Supp. 657, 673 (M.D.Pa.1989); *ARA Services, Inc. v. School Dist. of Philadelphia,* 590 F.Supp. 622, 629 (E.D.Pa.1984).

Plaintiff has failed to state with particularity how defendants have acted to create an irrational classification. Furthermore, she has not stated to which class of persons she belongs or, for that matter, that a class of persons subject to discrimination exists. According to the record, plaintiff is the sole Learnball advocate seeking access to Letsche or any other Pittsburgh public school. Under these facts, plaintiff at most has established that defendants treated her in a discriminatory and arbitrary fashion. The Equal Protection clause was not intended to address government action, however arbitrary, if it is directed solely at an individual.

However, to the extent that advocates of Learnball constitute a "class," the School's policy does not violate the Equal Protection clause. Classifications based on race, national origin, alienage, sex, and, illegitimacy must survive a heightened level of scrutiny in order to pass constitutional muster. *Cleburne,* 473 U.S. at 440–41, 105 S.Ct. at 3254–55. All other classifications need only be rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254.

In this case, the School's policy is designed to promote a legitimate state purpose, namely the education of at-risk high school students. In addition, the School's policies are specifically fashioned to achieve this purpose. Dr. Nicholson has restricted the use of Learnball because, *inter alia,* it has not been shown to improve student's academic performance, it diverts too much class time away from actual instruction, and the skills it develops do not enhance a students' college or career opportunities.

Therefore, to the extent that defendants can be said to have created a class-based distinction between those who advocate Learnball and those who do not, we find that the School's distinction is rationally related to a legitimate state purpose and, therefore, does not violate plaintiff's Fourteenth Amendment right to equal protection under the law.

### III.

We hold that defendants' policy does not violate plaintiff's First or Fourteenth Amendment rights. Accordingly, we enter judgment in favor of defendants and against plaintiff.