**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 28 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PAULA HORSTKOETTER; L.D.
HORSTKOETTER; KIM DEAN; JEFF
DEAN,

        Plaintiffs - Appellants,

    v.

DEPARTMENT OF PUBLIC
SAFETY, State of Oklahoma, ex rel.;
MIKE GRIMES; JERRY CASON;
LARRY WARLICK,

        Defendants - Appellees.

No. 97-6367

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 97-CV-529)**

---

David B. Christian, Woodward, Oklahoma, for Appellants.

Cara Epps Clifton, Department of Public Safety, Oklahoma City, Oklahoma, for Appellees.

---

Before **ANDERSON, HOLLOWAY** , and **BALDOCK** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

In this case, we must determine whether the State of Oklahoma, through its Department of Public Safety ("the Department"), may, consistent with the First Amendment, prohibit members of the Oklahoma Highway Patrol from displaying political signs at their private residences, even if the signs were placed there by members' spouses. L.D. Horstkoetter and Jeff Dean, members of the Oklahoma Highway Patrol, and their wives, Paula Horstkoetter and Kimberly Dean (collectively, "Plaintiffs"), brought this action, pursuant to 42 U.S.C. § 1983, against the Department and three of the troopers' supervisors (collectively, "Defendants"), contending that they violated the Plaintiffs' First Amendment rights to freedom of speech and expression by ordering them to remove political signs from their private yards. The district court entered summary judgment as to all claims in favor of the Defendants. For the reasons discussed below, we affirm.

**BACKGROUND**

During the 1996 election season, Paula Horstkoetter and Kimberly Dean asked Les Morton, a challenger candidate for Woodward County Sheriff, to place campaign signs in their yards. The Horstkoetter property is owned by L.D. and Paula Horstkoetter in joint tenancy; the Dean property is titled in the name of Jeff Dean only.

Several days after the wives placed the signs in the yards, the troopers' supervisor, Mike Grimes, instructed several Oklahoma Highway Patrol troopers, including Larry Warlick, to check the homes of other troopers to see whether any campaign signs were visible in members' yards. Grimes ordered this reconnaissance pursuant to a departmental policy which prohibits members of the Oklahoma Highway Patrol from displaying partisan political signs at their residences. The policy states, in relevant part, that

> [m]embers [of the Oklahoma Highway Patrol] shall not wear a political badge, button, or similar partisan emblem. Members shall not display any partisan political sticker or sign on motor vehicles operated by them or under their control and shall not publicly display any partisan political stickers or signs at their residences.

Oklahoma Highway Patrol General Policy Order 78-52-2.16(d) (emphasis added).

After Grimes learned that there were signs at the Horstkoetter and Dean residences, Oklahoma Highway Patrol supervisors, including Jerry Cason, approached L.D. Horstkoetter and Jeff Dean separately and told them to remove the signs. Both Horstkoetter and Dean objected to the demand, stating that the signs belonged to their wives. The supervisors responded that it did not matter that the signs belonged to their wives, and that if the troopers did not remove the signs quickly, they could be suspended or even terminated. Horstkoetter and Dean called their wives and explained that their jobs would be put in jeopardy if

-3-

the signs were not removed.  When the wives heard of this possible threat to their husbands' livelihood, they removed the signs.

Ms. Horstkoetter then sent a letter to the Commissioner of Oklahoma's Department of Public Safety, explaining the situation and expressing her dissatisfaction with its resolution.  In response, Colonel Gene Lockwood, Chief of the Oklahoma Highway Patrol, sent a letter to Ms. Horstkoetter, informing her of the departmental policy, and explaining to her that the Department would continue to enforce the policy in the future.  Lockwood endorsed the interpretation the supervisory officers had given to the policy, and stated that because Ms. Horstkoetter was married to a patrolman, certain restrictions were therefore placed on the residential property.  In the letter, Lockwood also hinted that Mr. Horstkoetter could potentially face criminal liability under a state statute, in addition to adverse employment action, if he took any active role in politics.  The state statute reads, in relevant part, as follows:

> No member . . . of the Oklahoma Highway Patrol Division shall, while in such position, be a candidate for any political office or take part in or contribute any money or other thing of value, directly or indirectly, to any political campaign or to any candidate for public office.  Anyone convicted of violating the provisions of this section shall be guilty of a misdemeanor and shall be punished as provided by law.

Okla. Stat. Ann. tit. 47, § 2-105(a) (West 1998).

After receiving the Department's response, the Horstkoetters and Deans filed this suit, alleging that the Department [1] and the individual defendants had, under color of state law, infringed upon their First Amendment rights to free expression, made applicable to the states by the Fourteenth Amendment. The Complaint sought damages, as well as a declaration stating that the policy of the Oklahoma Highway Patrol is unconstitutional, both on its face and as applied to Plaintiffs, and an injunction barring Defendants from enforcing the departmental policy. In May 1997, approximately two months after the complaint was filed, L.D. Horstkoetter retired from the Oklahoma Highway Patrol.

At the close of discovery, the Department and the individual defendants moved for summary judgment, and Ms. Horstkoetter and Ms. Dean moved for partial summary judgment. The district court resolved these cross motions on October 2, 1997. First, the district court held that Defendants were entitled to summary judgment as to the claims of Mr. Horstkoetter and Mr. Dean, because, in view of the undisputed fact that the signs belonged to the wives, the patrolmen had engaged in no protected speech or expression. Next, the district court held

---

[1] Plaintiffs' claims against the State of Oklahoma's Department of Public Safety, as well as their claims against the individual defendants in their official capacities, were dismissed by the district court pursuant to Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Plaintiffs do not appeal the district court's dismissal of these claims. Thus, the only claims that remain on appeal are the plaintiffs' claims against the individual defendants in their personal capacities.

that the wives had engaged in protected political speech, and that the wives had standing to challenge the Department's requirement that they remove the signs. Finally, however, the court held that the individual defendants were entitled to qualified immunity from suit, because it found that the law in this area was not sufficiently clear to make the unlawfulness of their conduct apparent. Therefore, the court entered summary judgment in favor of Defendants as to the wives' claims as well, and denied the wives' motion for partial summary judgment. The district court's order contained no discussion of the plaintiffs' claims for injunctive or declaratory relief.

On appeal, Mr. Horstkoetter and Mr. Dean claim that they, along with their wives, engaged in protected political speech. Also, all Plaintiffs claim that the individual defendants are not entitled to qualified immunity in this case because the law in the First Amendment area is sufficiently clear. Finally, all Plaintiffs claim that the district court erred by refusing to dispose of their claims for injunctive and declaratory relief. In response, the Department and the individual defendants argue in favor of affirmance, but additionally argue that the wives do not have standing to bring this suit.

**STANDARD OF REVIEW**

We review a decision granting summary judgment de novo, using the same legal standard applicable in the district court. See Miles v. Denver Pub. Sch., 944 F.2d 773, 775 (10th Cir. 1991). In cases involving the First Amendment, the de novo standard is "appropriate . . . for the further reason that . . . '[i]n cases raising First Amendment issues . . . an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.'" Lytle v. City of Haysville, 138 F.3d 857, 862 (10th Cir. 1998) (quoting Rankin v. McPherson, 483 U.S. 378, 386 n.9, 107 S. Ct. 2891, 2898 n.9, 97 L. Ed. 2d 315 (1987)). Summary judgment is proper only in cases where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995).

**DISCUSSION**

**I.    The Claims of L.D. Horstkoetter and Jeff Dean**

Mr. Horstkoetter and Mr. Dean assert that their First Amendment rights were violated when their supervisors, pursuant to departmental policy, required them to remove their wives' political signs or face potential disciplinary action.

### A. The Pickering/Connick Balancing Test

The patrolmen's claims raise the issue of whether, and to what extent, the government, acting as an employer, can restrict the speech of its public employees. When the government is acting as an employer, rather than as a sovereign, the First Amendment does not apply with full force. Although the government, acting as an employer, "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," Connick v. Myers, 461 U.S. 138, 142, 103 S. Ct. 1684, 1687, 75 L. Ed. 2d 708 (1983), a government employer "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." United States v. National Treasury Employees Union (NTEU), 513 U.S. 454, 465, 115 S. Ct. 1003, 1012, 130 L. Ed. 2d 964 (1995). To determine whether a public employer has infringed the employee's freedom of expression, we apply a four-part test, known as the Pickering/Connick test. See Pickering v. Board of Education, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35, 20 L. Ed. 2d 811 (1968); Lytle, 138 F.3d at 863; see also NTEU, 513 U.S. at 467, 115 S. Ct. at 1013 (stating that "the Government must be able to satisfy a balancing test of the Pickering form to maintain a statutory restriction on employee speech"). The first two parts of this test are

questions of law for the court; the remaining two steps are questions of fact for the jury.  Cragg v. City of Osawatomie, 143 F.3d 1343, 1346 (10th Cir. 1998).

First, we must consider whether the speech in question involves a matter of public concern.  A matter is of public concern, and therefore entitled to First Amendment protection, if it is "of interest to the community, whether for social, political, or other reasons."  Lytle, 138 F.3d at 863 (citing  Connick, 461 U.S. at 145-49, 103 S. Ct. at 1689-91).  If the matter is of merely personal interest to the government employee, then the speech is not protected by the First Amendment. Id.

If the speech is found to be of public concern, the court must then weigh the employee's interest in the expression against the government employer's interest in regulating the speech of its employees so that it can carry on an efficient and effective workplace.  See Pickering, 391 U.S. at 568, 88 S. Ct. at 1734-35.  The employee's speech is protected only if his interest in engaging in the speech outweighs the government employer's interest in regulating it.

Next, the employee must show that the speech was a substantial factor driving the challenged governmental action.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977).  And finally, if the employee can make the showings required by the first three parts of the test, the employer is then given the opportunity to show that it

would have taken the same employment action against the employee even in the absence of the protected speech.    Id.


### B.    The Test Applied to this Case

Mr. Horstkoetter and Mr. Dean do not contest the government's power generally to restrict the political speech of its employees.  For over a century, courts have upheld regulations, such as the federal Hatch Act, curtailing the rights of public employees to engage in certain kinds of political speech.    See United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers   , 413 U.S. 548, 93 S. Ct. 2880, 37 L. Ed. 2d 796 (1973);    United Public Workers v. Mitchell   , 330 U.S. 75, 67 S. Ct. 556, 91 L. Ed. 754 (1947);    Ex Parte Curtis  , 106 U.S. 371, 1 S. Ct. 381 (1882).  These regulations were enacted to further several legitimate and important interests of government, including the following:  (1) the protection of public employees' job security,    see Letter Carriers  , 413 U.S. at 566, 93 S. Ct. at 2890-91 (stating that placing restrictions on the political speech of public employees "make[s] sure that Government employees [are] free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs"); (2) the eradication of corruption,    see id., 413 U.S. at 557-58, 559-60, 93 S. Ct. at 2886-87, 2890 (discussing the anti-corruption origins of the

civil service rules and the Hatch Act); (3) the promotion of efficiency in government offices, see Waters v. Churchill, 511 U.S. 661, 674-75, 114 S. Ct. 1878, 1887-88, 128 L. Ed. 2d 686 (1994) (plurality opinion) (stating that "[g]overnment agencies are charged by law with doing particular tasks," that "[a]gencies hire employees to help do those tasks as effectively and as efficiently as possible" and that "[w]hen [an employee] . . . begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her"); and (4) the encouragement of impartiality, and the public perception of impartiality, in government services. See Letter Carriers, 413 U.S. at 565, 93 S. Ct. at 2890 (stating that public employees "are expected to enforce the law . . . without bias or favoritism" and that "[a] major thesis of the Hatch Act is that to serve this great end of Government–the impartial execution of the laws–it is essential that federal employees" not become involved in politics).

These permissible restrictions on political speech can also apply to employees of state and local governments, see Broadrick v. Oklahoma, 413 U.S. 601, 606, 93 S. Ct. 2908, 2913 (1973) (upholding state laws similar to the federal Hatch Act), including law enforcement officers. [2] See, e.g., Reeder v. Kansas

_____

[2]Nearly every state in this circuit, as well as most states outside the circuit, has a statute restricting the political activities of highway patrol members. See, (continued...)

-11-

City Board of Police Comm'rs, 733 F.2d 543, 547 (8th Cir. 1984) (upholding Mo. Rev. Stat. § 84-830, which prohibited members of the Kansas City Police Department from making any political campaign contributions); Wachsman v. City of Dallas, 704 F.2d 160 (5th Cir. 1983) (upholding various provisions of the Dallas city charter which prevented city police officers from making contributions to or soliciting contributions for city council candidates); Otten v. Schicker, 655 F.2d 142, 144 (8th Cir. 1981) (upholding a St. Louis Police Department local rule which prevented officers from running or campaigning for public office); Perry v. St. Pierre, 518 F.2d 184, 186 (2d Cir. 1975) (upholding a provision of the Plattsburgh, New York, city charter which made it unlawful for a city police officer to, among other things, "attempt to influence any voter").

The patrolmen's First Amendment challenge, then, is a narrow one: Mr. Horstkoetter and Mr. Dean assert that the government's well-established power to regulate the political speech of its employees does not extend far enough to

---

[2](...continued)
e.g., Colo. Rev. Stat. Ann. § 24-33.5-215 (1997); Kan. Stat. Ann. § 74-2113(e) (1997); Okla. Stat. Ann. tit. 47, § 2-105(a) (West 1998); Utah Code Ann. § 67-19-19 (1997); see also Ky. Rev. Stat. Ann. § 16.170 (Michie 1996); Mich. Comp. Laws Ann. § 28.10 (West 1997); Miss. Code Ann. § 45-3-11 (1998). Other states have enacted less restrictive statutes which prohibit officers from engaging in political activity while at work or while using state resources, but authorizing officers to participate in politics on their own time. See, e.g., Ark. Code Ann. § 12-8-205 (Michie 1997) (amended 1997); N.M. Stat. Ann. § 29-14-10 (Michie 1998).

sustain a regulation prohibiting a state law enforcement officer from placing political signs on his residential property. We analyze this challenge under the framework of the Pickering/Connick test set forth above.

Mr. Horstkoetter and Mr. Dean cannot meet the requirements of the Pickering/Connick test in this case. Even assuming that Mr. Horstkoetter and Mr. Dean can survive the first hurdle, [3] they must show that their interest in the expression outweighs the government employer's interest in regulating it. This they cannot do. Certainly, the employees here have a strong interest in engaging in political speech. Indeed, "[t]he First Amendment affords the broadest protection to . . . political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes

---

[3]There is some question as to whether the troopers were even engaging in speech at all. The district court held that the troopers were not engaging in any constitutionally protected speech, in view of the undisputed fact that the signs were requested by the troopers' wives, and not by the troopers themselves. Indeed, when confronted by their supervisors about the signs, both patrolmen protested that the signs were not theirs, but were their wives'. If the patrolmen were not speaking, they cannot meet the first requirement of the test, because the patrolmen cannot be said to have engaged in speech regarding matters of public concern if they were not speaking at all. There is, however, some force to the argument that at least Mr. Dean was speaking, even if Mr. Horstkoetter was not, because Mr. Dean has sole title to the Dean residence, including the legal right to exclude his wife's signs, and may therefore be said to have implicitly adopted the signs as his own speech. To the extent the patrolmen were speaking, that speech would undoubtedly be related to matters of public concern. See Zorzi v. County of Putnam, 30 F.3d 885, 896 (7th Cir. 1994) (stating that an employee fired for participating in political activity was engaging in speech on matters of public concern).

-13-

desired by the people." Buckley v. Valeo , 424 U.S. 1, 14, 96 S. Ct. 612, 632, 46 L. Ed. 2d 659 (1976) (internal quotation marks omitted). However, we think that the employer's interest in regulating troopers' political signs outweighs that interest.

The Oklahoma Highway Patrol's policy prohibiting troopers from displaying political yard signs serves at least three of the governmental interests set forth in the Hatch Act cases. [4] See Letter Carriers , 413 U.S. at 557-66, 93 S.

---

[4]Plaintiffs argue that, in order for the balancing test to weigh in the government's favor, there must be evidence in the record that the removal of these particular political signs furthered the interests behind the policy. The district court seemed to agree, citing Gardetto v. Mason, 100 F.3d 803, 815-16 (10th Cir. 1996) (stating that "the government . . . cannot rely on purely speculative allegations that certain statements caused or will cause disruption to justify the regulation of employee speech"). While this may be true in cases involving employees who were fired for isolated instances of disruptive speech or whistleblowing not connected to any statute or policy, see Rankin v. McPherson, 483 U.S. 378, 380, 388-89, 107 S. Ct. 2891, 2899, 97 L. Ed.2d 315 (1987) (where an employee criticized President Reagan, stating after the 1981 assassination attempt that "[i]f they go for him again, I hope they get him"); Gardetto, 100 F.3d at 815-16 (where an employee was openly critical of the policies of her supervisor and her employer), such a showing is not required when the constitutionality of a particular regulation curtailing political speech is at issue, at least where that regulation is aimed at protecting, rather than restricting, the rights of public employees. For instance, in Mitchell, the Supreme Court upheld the constitutionality of the Hatch Act without a particularized showing that the statute's interests were furthered in that specific case, stating that even though the particular employee at issue, a roller in the mint, was a relatively non-influential employee,

Congress may have concluded that the activity may promote or retard his advancement or preferment with his superiors. Congress may have thought
(continued...)

-14-

Ct. at 2886-91; Mitchell, 330 U.S. at 101, 67 S. Ct. at 570. First, the policy serves to "assure persons aspiring to careers in law enforcement that they are not obliged to make public display of political affiliation or defer to the wishes of political dignitaries in order to guarantee retention and promotion." Pollard v. Board of Police Comm'rs, 665 S.W.2d 333, 336 (Mo. 1984), cert. denied, 473 U.S. 907, 105 S. Ct. 3534, 87 L. Ed. 2d 657 (1985). In the absence of this

---

[4](...continued)
that government employees are handy elements for leaders in political policy to use in building a political machine. For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service. There are hundreds of thousands of United States employees with positions no more influential than [the roller in the mint]. Evidently what Congress feared was the cumulative effect on employee morale of political activity by all employees who could be induced to participate actively. It does not seem to us an unconstitutional basis for legislation.

Mitchell, 330 U.S. at 75, 101, 67 S. Ct. at 570. Likewise, in Letter Carriers, the Court did not require a particularized showing. 413 U.S. at 564, 93 S. Ct at 2889 (stating that "[a]lthough Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has so far struck is sustainable by the obviously important interests sought to be served" by such restrictions on public employees' political speech). And in United States v. National Treasury Employees Union, 513 U.S. 454, 470-71, 475-76 n.21, 115 S. Ct. 1003, 1015, 1017-18 n.21, 130 L. Ed.2d 964 (1995), the Court did require some evidence of disruption, but only because the regulation at issue there, a ban on honoraria, was, unlike the Hatch Act and other similar regulations on political speech, aimed at restricting employees' rights rather than protecting their job security. We are persuaded that, in cases involving a constitutional challenge to a regulation on public employees' political speech, the government need not make a particularized showing where at least one of the interests served by the regulation is the protection of public employees' job security.

-15-

policy, troopers could feel pressure to display signs advocating the election of candidates favored by superiors.

Second, the policy promotes efficiency and harmony among law enforcement personnel. In some cases, public endorsement of candidates by police officers has stirred great controversy within police departments and has detracted from "the efficiency and the quality of the services" provided by law enforcement. See Ruff v. City of Leavenworth, 858 F. Supp. 1546, 1554 (D. Kan. 1994).

Third, the policy "proclaim[s] that police protection will be available to the public, free from political overtones, and that the police will deal impartially with all who give them concern." Pollard, 665 S.W.2d at 336. Also, the policy helps to further harmonious relations between state police, local law enforcement, and the citizenry. In many rural communities, such as northwestern Oklahoma, "[a] state trooper is often the most conspicuous representative of the state government to a large percentage of the population, . . . who may view the trooper as a symbol of stability and authority." Wicker v. Goodwin, 813 F. Supp. 676, 681 (E.D. Ark. 1992). Such policies help to avoid the perception that public law enforcement organizations support a particular political candidate or party. "[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to

be avoiding it, if confidence in the system of representative Government is not to be eroded . . . ." Letter Carriers , 413 U.S. at 565, 93 S. Ct. at 2890. "It is proper for a state to insist that the police be, and appear to be, above reproach, like Caesar's wife." Reeder , 733 F.2d at 547 .

Most courts that have considered the issue have concluded that the government's interest in regulating the political speech of law enforcement personnel outweighs the individual officer's interest in engaging in certain kinds of political speech. Indeed, courts have held that a government employer's power to curtail the political speech of law enforcement personnel extends far enough to ban activities such as attempting to influence voters, endorsing political candidates, and displaying political signs in their yards. See, e.g., Perry v. St. Pierre , 518 F.2d at 186 (upholding a provision of the Plattsburgh, New York, city charter which made it unlawful for a city police officer to, among other things, "attempt to influence any voter"); Wicker , 813 F. Supp. at 680-81 (upholding, against a First Amendment challenge, Ark. Code Ann. § 12-8-205 (before its 1997 amendments), which prohibited members of the Arkansas State Police from making contributions to or participating in campaigns, among other things); cf. Ruff, 858 F. Supp. at 1554-55 (holding that a city may constitutionally prohibit police officers from endorsing candidates, even though holding that the city's stated policy banning all "political activity" was

overbroad).   We are persuaded that the government's well-established right to restrict the political speech of its employees extends far enough to allow state and local law enforcement organizations to prohibit members from displaying political signs at their residences.   [5]

The <u>Wicker</u> case is especially apposite here.  In that case, the court passed on the constitutionality of an Arkansas statute which barred members of the state police from participating in political campaigns.   <u>See</u> Ark. Code Ann. § 12-8-205 (before 1997 amendments).  One of the plaintiff troopers had been suspended without pay for violating the statute, because he had, among other things, "erect[ed] yard signs [and] ha[d] a bumper sticker displayed on a privately owned vehicle."   <u>Wicker</u>, 813 F. Supp. at 679.  The court upheld the statute, as applied to this trooper, against a First Amendment challenge, holding that the state's interest in regulating trooper speech outweighed the trooper's interest in displaying yard signs and bumper stickers.  The court stated that the statute

_____

[5]In cases involving other less emblematic public employees, the balance may come out differently.  Indeed, under the federal Hatch Act, federal "employees" are allowed to display signs at their residences, <u>see</u> 5 C.F.R. § 734.205(a) (1998), but this permission does not extend to "member[s] of the uniformed services."  5 C.F.R. § 734.101 (1998) (defining "employee," for purposes of that subpart, as excluding "member[s] of the uniformed services").  And at least one court has held that general city employees cannot be prohibited from displaying political signs in their yards.  <u>See</u> Goodman v. City of Kansas City, 906 F. Supp. 537 (W.D. Mo. 1995).  But for high-profile public employees, such as law enforcement personnel, we are confident that the constitutional balance weighs in favor of the government.

"serves several valid and important interests," including ensuring "troopers job security, free from the vicissitudes of the election process; . . . avoid[ing] the appearance of political partisanship on the part of the Arkansas State Police; and . . . promot[ing] a harmonious working relationship between the State Police, citizens, and political officials throughout the State." Id. at 681.

We conclude, therefore, that the interests of the government employer, here the Oklahoma Highway Patrol, in prohibiting political yard signs outweigh the patrolmen's interest in displaying the yard signs. Thus, the patrolmen cannot meet the second requirement of the Pickering/Connick test. Accordingly, we hold that the First Amendment does not prohibit a state from barring members of its highway patrol or state police from displaying political signs in their private yards. The policy of the Oklahoma Highway Patrol prohibiting troopers from displaying political signs in their yards is facially constitutional under the First Amendment.

### C.     The Limits of the Oklahoma Highway Patrol's Policy

Our holding that the policy of the Oklahoma Highway Patrol is constitutional is not without limits. By its plain language, the policy applies only to "[m]embers" of the Oklahoma Highway Patrol, and not to members' spouses. Our holding permits the Oklahoma Highway Patrol to take disciplinary action

-19-

against members who display political signs in their private yards. Thus, if the trooper, rather than the trooper's spouse, requests that a sign be placed in his yard, that trooper may be disciplined without offending the Constitution.

A more difficult question arises when the trooper's spouse erects a sign in the residential yard. The district court resolved this situation by determining that the signs belonged to the spouses rather than to the troopers. Under the district court's analysis, the state may not constitutionally discipline the trooper if the speech in the residential yard is the spouse's speech rather than the trooper's. The crucial factor under the district court's analysis was whether the speech was that of a trooper or that of a spouse. While this analysis is wholly defensible as far as it goes, we think it does not go far enough in explaining the circumstances under which a state may discipline a trooper for having a sign in his private yard. A way to look at this situation in a manner more directly related to the trooper's personal accountability is in terms of the trooper's lawful right to remove the sign from his residential property. If a trooper has sole ownership, or its equivalent, of the residential property, then, by legal definition, he has the lawful right to remove political signs from his property, whether placed there by himself, his spouse, or a passerby. By refusing to exercise this legal right to remove the sign, the trooper would seem, at least implicitly, to be adopting the sign as his own, even if the sign was placed there by someone else. And, in such

a situation, it becomes difficult to escape the conclusion that the trooper is violating the state's requirement that he refrain from displaying signs at his residence. Therefore, as applied to troopers who have sole title, or its state law equivalent, in their residential property, the policy may extend far enough to allow a state to take disciplinary action against a trooper who has a political sign in his yard, even if the sign was originally placed there by another person.

However, the situation changes where someone else owns, or has an ownership interest in, the residential property. The trooper clearly does not have the right to remove signs placed in a yard owned by a spouse or by someone else, or in which the spouse or others have a property interest, such as a joint tenancy or tenancy in common. See Matthews v. Matthews, 961 P.2d 831, 834-35 (Okla. 1998) (stating that "[o]ne who stands in a cotenancy relation to another may not act or claim 'in derogation of' the [other cotenants'] interest" and that "[t]his means that a cotenant is not allowed to lessen or diminish the value or effect of the other cotenant's right, title, interest or status in the land" (citations and footnotes omitted)); 20 AM. JUR.2D Cotenancy and Joint Ownership § 1 (1997) (stating that "[i]n a true cotenancy the interest of each cotenant is coextensive with the common property and extends to every part of the property, although none has the right to occupy any particular part of it to the exclusion of the others"). A state highway patrol organization cannot, through a policy restricting

political speech, require a trooper to do what property law does not allow him to do. Therefore, as applied to situations in which a trooper has no interest, or merely a joint or common interest, in his residential property, the policy cannot extend far enough to allow a trooper to be disciplined for not removing a sign from his residential property placed there by one who possesses a common interest in the property, so long as the sign is solely the speech of the common interest holder. [6]

To apply these principles to the case before us, we must look to the property interests of the Plaintiffs. The Dean residence is titled solely in the name of Jeff Dean. Appellee's App. at 203. Under the facts presented to us in this case, Ms. Dean has no property interest in the residential property. [7]

---

[6]We note, however, that even in situations where the trooper does not have the sole property interest in his residence, the trooper may be constitutionally barred from erecting a sign in his yard. In these situations, the property aspect of the analysis is unhelpful, and the speech-based analysis set forth by the district court is sufficient. The focus of the regulation is on what the trooper does or fails to do with respect to signs under his control. Therefore, if there is evidence to indicate that the trooper, rather than another cotenant, placed the sign there, the trooper may constitutionally be disciplined. Thus, there are two situations in which a state may constitutionally discipline a trooper for displaying a political sign at his residence: (1) where the trooper is the sole interest holder in the residential property; and (2) where there is evidence in the record that the trooper himself placed, or caused to be placed, the sign at his residence.

[7]On the record before us, we know only that the Dean property is titled in the name of Jeff Dean. We are unaware of any other potential interests, based in other areas of state law, that Ms. Dean might have in the residential property. For instance, Oklahoma family law may provide non-titled spouses certain rights in

(continued...)

-22-

Therefore, the policy of the Oklahoma Highway Patrol can extend far enough to prohibit Mr. Dean from displaying, or allowing the display of, political signs at the Dean residence, and the Oklahoma Highway Patrol may, within the bounds of the Constitution, discipline Mr. Dean for displaying, or for refusing to remove, political signs in his yard, even if the signs were originally placed there by someone else. Therefore, all of Mr. Dean's claims must fail, and the district court properly granted summary judgment in favor of the Defendants as to the claims of Jeff Dean.

The Horstkoetters present a different situation. Mr. and Ms. Horstkoetter own their residence together as joint tenants. Appellee's App. at 201. By attempting to enforce its policy against the Horstkoetters, the Oklahoma Highway Patrol is essentially requiring Mr. Horstkoetter, upon penalty of disciplinary action, to remove his wife's sign from her property. The Oklahoma Highway Patrol cannot constitutionally extend its policy so far. Any discipline imposed under these circumstances would violate Mr. Horstkoetter's constitutional rights.

---

[7](...continued)
the residential property. However, such interests have not been brought to the attention of this court, and thus, on the record before us, we must conclude that Ms. Dean has no property interest in the Dean family residence.

### D. Mr. Horstkoetter's Remedies

As remedies for the potential violation of his constitutional rights, Mr. Horstkoetter seeks injunctive and declaratory relief, as well as damages. Defendants argue that Mr. Horstkoetter's claims for prospective relief have been mooted by his retirement, and that his claims for damages are precluded because the individual defendants are entitled to qualified immunity. We agree.

### 1. Mootness

Mootness, like standing, stems from the Article III requirement that federal courts hear only "Cases" and "Controversies." U.S. Const. art. III, § 2. Indeed, mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22, 117 S. Ct. 1055, 1069 n.22, 137 L. Ed. 2d 170 (1997) (citations omitted). Mr. Horstkoetter certainly had standing to bring this suit at the outset of the litigation, and indeed he still has standing to seek retrospective relief such as damages. However, his claims for prospective relief will be mooted "[i]f an event occurs while a case is pending that heals the injury." Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997); see also McClendon v. City of Albuquerque, 100 F.3d 863, 867 (10th Cir. 1996)

-24-

(stating that "[w]hen a party seeks only equitable relief, . . . past exposure to alleged illegal conduct does not establish a present live controversy if unaccompanied by any continuing present effects").

Mr. Horstkoetter's retirement from the Oklahoma Highway Patrol has mooted his claims for prospective relief. Because he is no longer a state trooper, and because the policy only applies to "[m]embers," Mr. Horstkoetter will now not come under any possible interpretation of the policy. Mr. Horstkoetter cannot show that there is any possibility that he could ever be subject to sanction by the Oklahoma Highway Patrol should he or his wife choose to erect political signs in their yard in upcoming political campaigns. Any injunction that we might issue in this case, prohibiting the highway patrol from applying its policy to Mr. Horstkoetter, would be meaningless, because the patrol has no reason to apply its policy to him now that he has left the patrol. Likewise, any declaratory judgment in favor of Mr. Horstkoetter would also be meaningless. See Southern Utah Wilderness Alliance, 110 F.3d at 730 (stating that "[f]or the same reasons that injunctive relief is not available, a declaratory judgment also is not available," because the "declaratory judgment would serve no purpose").

Because Mr. Horstkoetter cannot "demonstrate a good chance of being likewise injured in the future," McClendon, 100 F.3d at 867, his claims for prospective relief are moot.

## 2. Qualified Immunity

Although Mr. Horstkoetter's claims for prospective relief have been rendered moot, his claims for damages have not. However, Defendants argue, and the district court held, that his claims for damages are barred by the doctrine of qualified immunity. We agree.

Qualified immunity is a doctrine which "shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Baptiste v. J.C. Penney Co., Inc., 147 F.3d 1252, 1255 (10th Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). The law provides these officials with qualified immunity because "it is impossible to know whether the claim is well-founded until the case has been tried," and "to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949); see also Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995) (stating that qualified immunity exists to "ensure that erroneous suits do not even go to trial"). The doctrine of qualified immunity "strik[es] a balance between compensating those who have

been injured by official conduct and protecting government's ability to perform its traditional functions." Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997).

When a defendant pleads qualified immunity, as these Defendants have done, the plaintiff must make a two-part showing. First, he must show that the defendant's actions violated a federal constitutional or statutory right. See Baptiste, 147 F.3d at 1255; Albright, 51 F.3d at 1534. As discussed above, Mr. Horstkoetter has cleared this first hurdle. We held above that the Oklahoma Highway Patrol cannot constitutionally extend its policy against political signs to Mr. Horstkoetter's situation, namely, where the trooper owns the residential property in joint tenancy, and where there is evidence to show that one of the other joint tenants, rather than the trooper, placed the sign at the residence.

Next, he must show that "the right violated was clearly established at the time of the conduct at issue." Baptiste, 147 F.3d at 1255. A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 997 L. Ed. 2d 523 (1987). Although a plaintiff need not show that the very action in question was previously held unlawful, id., she must demonstrate that there is a "Supreme Court or Tenth Circuit decision on point, or the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

Often, the court's determination about whether the right is clearly established turns on the level of generality to be applied. On a very general level, all constitutional rights are clearly established. For instance, in Anderson the Court noted that the Fourth Amendment right to be free from unreasonable searches and seizures was clearly established, but held that it was not clear whether the Fourth Amendment's protections extended to the particular factual situation at issue in that case. Anderson, 483 U.S. at 639-40, 107 S. Ct. at 3038. Too general an approach "would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties.'" Id. at 639 (citations omitted). In this circuit, we require "some but not precise factual correspondence" between the cases cited and the factual situation in the case at hand. Lawmaster, 125 F.3d at 1351.

Here, Mr. Horstkoetter argues that his wife's right to display signs, and therefore his right not to be punished for her displays, is clearly established. In support of that proposition, he cites four cases. City of Ladue v. Gilleo, 512 U.S. 43, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994); Burson v. Freeman, 504 U.S. 191,

-28-

196-97, 112 S. Ct.1846, 1850, 110 L. Ed. 2d 5 (1992);      Buckley , 424 U.S. at 14, 96 S. Ct. at 632;  Spence v. Washington   , 418 U.S. 405, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974).  All of these cases stand for propositions far too general to assist Mr. Horstkoetter here; none of the cited cases deals at all with the rights of public employees or their spouses.    Burson  and Buckley  contain only the most general statements to the effect that political speech is entitled to the highest protections. And Ladue  and Spence  deal only with the rights of persons who are not public employees, and give no guidance at all to government employers about how to handle situations where otherwise lawful restrictions on the political speech of public employees incidentally impact the speech of those employees' spouses.  As such, these cases cannot assist Mr. Horstkoetter in showing that the law at the time was clearly established.

Mr. Horstkoetter cites no other cases in support of his contention that the law was clearly established.  Both this court and the district court conducted exhaustive research on the issue, and were unable to find any cases which set forth the contours of the limits of government's power to indirectly restrict the political speech of public employees' spouses.

In sum, the rights of a spouse of a law enforcement officer to display signs at her residence were not clearly established at the time of Defendants' actions. Defendants' interpretation of their policy, in view of the law at the time, was not

clearly unlawful. Therefore, defendants Grimes, Cason and Warlick are entitled to qualified immunity. Mr. Horstkoetter is not entitled to a damages award against these Defendants. The district court properly entered summary judgment in favor of Defendants as to the claims of L.D. Horstkoetter.

## II.     The Claims of Paula Horstkoetter and Kimberly Dean

Before we may reach the merits of Ms. Horstkoetter's and Ms. Dean's claims that their First Amendment rights were violated, we must first decide whether Ms. Horstkoetter and Ms. Dean have standing to bring their claims. Standing is a concept rooted in Article III of the U.S. Constitution, which requires that federal courts hear only actual "Cases" and "Controversies." U.S. Const. art. III, § 2. The "irreducible constitutional minimum" of Article III's case-or-controversy requirement contains three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136-37, 119 L. Ed. 2d 351 (1992); Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445, 447 (10th Cir. 1996). First, the plaintiff must have suffered an "injury in fact" that is "concrete" rather than "conjectural or hypothetical." Lujan, 504 U.S. at 560, 112 S. Ct. at 2130. Second, the plaintiff must show that there is a "causal connection between the injury and the conduct complained of." Id. Finally, the plaintiff must show that

-30-

it is "likely" and not merely "speculative" that the injury complained of will be "redressed by a favorable decision."     Id., 504 U.S. at 561, 112 S. Ct. at 2130.

Here, Defendants claim that the troopers' wives do not have standing because they do not allege an "injury in fact." Ms. Horstkoetter and Ms. Dean claim, in turn, that they were injured because, in order to spare their husbands' jobs, they were required to remove their signs from their private yards. We hold that, because they were never in danger of being directly punished under the policy, Ms. Horstkoetter and Ms. Dean have standing only to raise the same claims as their husbands, and do not have standing to raise any separate claims of their own.

By its own terms, the policy can only apply to troopers, and not troopers' spouses. It is true that the Oklahoma Highway Patrol interpreted the policy to restrict the property rights of the spouses as well. Indeed, Col. Lockwood told Ms. Horstkoetter that because she was married to a trooper, "there are certain restrictions placed on [her] property." Appellant's. App. vol. III, at 58. However, the only penalties that can be inflicted upon anyone for violations of the policy, even as interpreted by the Oklahoma Highway Patrol, were employment sanctions or criminal penalties against the troopers themselves. Under the terms of the policy itself, there was never any possibility of disciplinary action against the wives directly. For instance, the Oklahoma Highway Patrol could not have

-31-

fined the wives, could not have imposed any criminal penalties upon the wives, or, because they are not troopers, taken disciplinary action against the wives in their respective employment situations. The Oklahoma Highway Patrol could not even have, within the law, physically removed the signs from the troopers' yards. In short, had the wives elected to leave the signs in the yard, the only possible action the highway patrol could have taken would have been to suspend or terminate the troopers themselves. Thus, there is no way that the wives could ever have been directly injured by any application of the policy. Therefore, in view of the fact that the state is not regulating their speech, the wives do not have standing to mount a separate and independent First Amendment challenge to the policy. The district court erred in holding that the wives had standing to raise separate claims, and therefore also erred in assessing the wives' claims under a different level of scrutiny than the husbands' claims.

However, Ms. Horstkoetter and Ms. Dean were, without question, indirectly injured by the application of the policy to their husbands, because their husbands were faced with a loss of income which would have affected the entire family. See Ben Oehrleins & Sons & Daughter v. Hennepin County, 115 F.3d 1372, 1379 (8th Cir. 1997) (stating that "indirect economic injury constitutes injury in fact" if, while indirect, the injury "is neither speculative nor merely incidental"). This indirect injury is, however, only enough to confer standing to raise, derivatively,

the same claims as their husbands raised. In other words, based on this injury, the wives' claims would in essence be that the state cannot constitutionally discipline their husbands for having political signs on their residential property, the same claim raised by their husbands. Thus, both the wives and the husbands have standing to challenge the constitutionality of the policy. However, the claims of the troopers' wives are exactly the same, and would be analyzed under the same standards, as the claims of the troopers themselves.

For the reasons discussed above, the troopers' claims fail, and therefore the claims of their spouses must necessarily fail with them. Accordingly, the district court properly entered summary judgment in favor of Defendants as to the claims of Paula Horstkoetter and Kimberly Dean.

## CONCLUSION

Accordingly, we AFFIRM the district court's grant of summary judgment in favor of the defendants as to all claims. It is so ordered.