**Mary WRZESINSKI, Plaintiff,**

**v.**

**District Court Judge Brent DANIELSON, of the 85th District Court for Benzie County, individually and in his official capacity and the County of Benzie, a Michigan Municipal corporation, Defendants.**

**Case No. 1:01–CV–278.**

United States District Court,
W.D. Michigan,
Southern Division.

Aug. 14, 2002.

H. Rhett Pinsky, Pinsky, Smith, Fayette & Hulswit, Grand Rapids, MI, for Plaintiff.

Margaret A. Nelson, Jennifer M. Granholm, Attorney General, Lansing, MI, David J. Bedells, David J. Bedells, PC, Traverse City, MI, for Defendants.

## OPINION

QUIST, District Judge.

Plaintiff, Mary Wrzesinski ("Wrzesinski"), has sued Defendants, Brent Danielson ("Danielson") and the County of Benzie (the "County"), pursuant to 42 U.S.C. § 1983 alleging that Defendant Danielson

discharged her from her employment in violation of her First Amendment rights. Now before the Court are Danielson's motion for summary judgment and the County's motion to dismiss.

## I. *Facts*

Danielson was elected as judge of the 85th Judicial District of Michigan in 1984 and has held that position until the present time. The 85th District Court ("District Court") is a single-judge district covering Manistee County and Benzie County. Danielson holds court at Manistee 3 days per week and at Benzie 2 days per week.

Wrzesinski became an employee of the District Court at Manistee in 1985. In 1987, pursuant to M.C.L. §§ 600.8501, 600.8503, Danielson appointed Wrzesinski as a non-attorney magistrate assigned to the Benzie County venue. As magistrate, Wrzesinski was responsible for reviewing search warrant affidavits and requests; periodically reviewing with Danielson the predetermined bonds set under the Interim Bond Act; arraignments in certain misdemeanors; imposing fines and costs in certain misdemeanors; felony arraignments; setting bond in cases where bond was not predetermined; conducting informal hearings on civil infractions; and representing Danielson and the District Court in the local community. In addition to her duties as magistrate, Wrzesinski served as the court administrator and the probation officer for the Benzie venue.

After several years, Danielson became concerned about Wrzesinski's conduct, particularly in her capacity as magistrate, which was governed by the Michigan Code of Judicial Conduct. One area of concern was her relationship with law enforcement officers who regularly appeared in that court. It was not uncommon for law enforcement officers to hang around Wrzesinski's office for long periods of time, socializing and discussing sex, sexual relationships, and other topics inappropriate to the work place, especially where a magistrate is supposed to make independent determinations on matters presented to her by these police officers. Danielson was concerned that these close relationships would create the appearance of impropriety. Danielson suspected that Wrzesinski was having an affair with one of the officers-a fact which Wrzesinski confirmed in her deposition. (Wrzesinski Dep. at 65, Def. Danielson's Br. Supp. Ex. 2.) The other area of concern to Danielson was Wrzesinski's political activity. In the early to mid–1990's, Wrzesinski was actively engaged in political activities on behalf of several candidates for county offices. Danielson reminded Wrzesinski of her obligation to refrain from engaging in political activity because of her position as a judicial officer.

By 2000, Danielson's trust and confidence in Wrzesinski and her ability to run the District Court had largely eroded. At that point, he began to consider terminating Wrzesinski's employment. During the summer of 2000, while Wrzesinski was on vacation, Danielson learned that a court clerk was planning to leave because of Wrzesinski's conduct. Danielson was also informed that Wrzesinski was again engaging in political activity because campaign signs had been placed in her yard. Danielson made his decision to terminate Wrzesinski after personally observing the yard signs. On July 20, 2000, when Wrzesinski returned from vacation, Danielson met with Wrzesinski and informed her of his decision to terminate her employment. Danielson allowed Wrzesinski to remain in her position for another two weeks to meet a commitment to marry friends, and Danielson also gave Wrzesinski the opportunity to resign. During the meeting, Danielson informed Wrzesinski of the reasons for his decision, including the fact that she was engaging in partisan politics as evidenced by the political signs

in her yard. Wrzesinski informed Danielson that her husband had placed the signs in their yard. Danielson told Wrzesinski that he did not believe that her husband was responsible for the signs. (Danielson Dep. at 72, Def. Danielson's Br. Supp. Ex. 1.). According to Danielson, Wrzesinski revealed that she had displayed a campaign button or sign on the bulletin board in her office. (*Id.* at 73–74.) Wrzesinski denies talking about the campaign button during the conversation. (Wrzesinski Dep. at 87, Def. Danielson's Br. Supp. Ex. 2.) Danielson did not investigate whether Wrzesinski was telling the truth about the political signs in her yard and adhered to his decision. Danielson terminated Wrzesinski's employment on July 31, 2000, after Wrzesinski refused to resign.

## II. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## III. *Discussion*

### A. Defendant Danielson[1]

 Danielson contends that he is entitled to summary judgment on the basis of qualified immunity. Qualified immunity shields "[g]overnment officials performing discretionary functions" from liability for civil damages "as long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Poe v. Haydon*, 853 F.2d 418, 423 (6th Cir.1988)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). A law enforcement officer is entitled to qualified immunity if "a reasonable [official] could have believed [his actions] to be lawful, in light of clearly established law and the information the [ ] [official] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). A plaintiff who seeks to hold an official protected by qualified immunity liable must: (1) identify "a clearly established right alleged to have been violated"; and (2) establish that "a reasonable police officer in [the] defendant[']s position should have known that the conduct at issue was undertaken in violation of that right." *Johnson v. Estate of Laccheo*, 935 F.2d 109, 111 (6th Cir. 1991); *see also Watkins v. City of Southfield*, 221 F.3d 883, 887 (6th Cir. 2000). The Supreme Court has clarified that a court's initial task in evaluating a qualified immunity defense is to determine whether the plaintiff has alleged the deprivation of a constitutional right. *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999). Sixth Circuit has described the procedure for determining qualified immunity as follows:

---

1. As part of his motion Danielson requests that the Court dismiss Wrzesinski's claim against him in his official capacity. Wrzesinski concedes that the official capacity claim should be dismissed. (Pl.'s Br. Opp'n at 7.) Therefore, the Court will dismiss the official capacity claim with prejudice.

The procedure for evaluating claims of qualified immunity is tripartite: First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.1999)(en banc)(citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157–58 (6th Cir.1996)).

To be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir.1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing" violates federal law. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). While replication of the official's specific conduct is not required to overcome qualified immunity, " 'pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*' " *Saylor v. Bd. of Educ.*, 118 F.3d 507, 515 (6th Cir.1997)(quoting *Lassiter v. Ala. A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir.1994)(en banc)). In the Sixth Circuit, courts look first to decisions of the Supreme Court, then to decisions of the Sixth Circuit and other courts within the Sixth Circuit, and finally to decisions of other circuits. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir.2000).

**1. Violation of a Constitutional Right**

The first issue in the qualified immunity analysis is the determination of whether the plaintiff has alleged the deprivation of a constitutional right. In this case, in particular, the Court must also determine what particular right Wrzesinski alleges was violated. As the Court noted at oral argument, the parties' briefs with respect to this issue are at substantial odds with one another. In his brief in support of his motion, Danielson argued that Wrzesinski cannot establish a violation of her First Amendment rights because she held a confidential and policymaking position which, pursuant to Supreme Court precedent, was not protected by the First Amendment with respect to political speech. *See Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52(1990). In her response brief, Wrzesinski conceded that she was a confidential employee and that Danielson had the right to discharge her for engaging in political activity without violating the First Amendment. In fact, Wrzesinski conceded that because she was an at-will employee, Danielson could have discharged her for any reason or for no reason at all and that Danielson in fact *had* sufficient grounds to discharge her at the time he made his decision. Wrzesinski argued, however, that Danielson misconstrues her claim, which is that Danielson violated her First Amendment rights by discharging her based on her husband's political activity, not her own political activity. Given Wrzesinski's admissions and the evidence in the record, the issue presented is: whether a governmental employer violates a confidential employee's First Amendment rights by discharging the employee based upon political activity by the em-

ployee's spouse where the employer believes that the employee was actually responsible for the political activity.

In support of her claim, Wrzesinski cites *Horstkoetter v. Department of Public Safety,* 159 F.3d 1265 (10th Cir.1998), in which two Oklahoma state troopers and their wives alleged that a policy of the Oklahoma Department of Public Safety prohibiting members of the Oklahoma Highway Patrol from displaying political signs at their private residences violated their First Amendment rights. The Tenth Circuit held that the policy did not violate the troopers' First Amendment rights. The court observed, however, that the policy could not be applied to the troopers based upon their wives' placement of political yard signs if their wives or someone placing the signs at the property also held an interest in the property. The court observed:

> If a trooper has sole ownership, or its equivalent, of the residential property, then, by legal definition, he has the lawful right to remove political signs from his property, whether placed there by himself, his spouse, or a passerby. By refusing to exercise this legal right to remove the sign, the trooper would seem, at least implicitly, to be adopting the sign as his own, even if the sign was placed there by someone else. And, in such a situation, it becomes difficult to escape the conclusion that the trooper is violating the state's requirement that he refrain from displaying signs at his residence. Therefore, as applied to troopers who have sole title, or its state law equivalent, in their residential property, the policy may extend far enough to allow a state to take disciplinary action against a trooper who has a political sign in his yard, even if the sign was originally placed there by another person.

> However, the situation changes where someone else owns, or has an ownership interest in, the residential property.

> The trooper clearly does not have the right to remove signs placed in a yard owned by a spouse or by someone else, or in which the spouse or others have a property interest, such as a joint tenancy or tenancy in common. A state highway patrol organization cannot, through a policy restricting political speech, require a trooper to do what property law does not allow him to do. Therefore, as applied to situations in which a trooper has no interest, or merely a joint or common interest, in his residential property, the policy cannot extend far enough to allow a trooper to be disciplined for not removing a sign from his residential property placed there by one who possesses a common interest in the property, so long as the sign is solely the speech of the common interest holder.

*Id.* at 1275–76 (citations and footnote omitted). The court found that the policy was unconstitutionally applied to one of the troopers because the trooper and his spouse owned their property as joint tenants. However, the court concluded that the defendants were entitled to qualified immunity because the right was not clearly established. *Id.* at 1278. Finally, the court concluded that the troopers' wives lacked standing to assert their own claims. *Id.* at 1279–80.

Wrzesinski also cites the concurring opinion in *International Association of Firefighters of St. Louis, Franklin and Jefferson Counties, Local 2665 v. City of Ferguson,* 283 F.3d 969 (8th Cir.2002), in which the Eighth Circuit held that a city's ban on certain political activity was constitutional. The plaintiff, a city employee, and his wife filed suit claiming that the provision violated their First Amendment rights. The court concluded that the provision was constitutional with regard to the plaintiff-employee. Disagreeing with *Horstkoetter* and other cases, however, the

court held that the wife had standing to assert her own claim that the enforcement of the provision against her husband based upon her political activities chilled her exercise of her First Amendment rights. In his concurring opinion, Judge Loken said that if the plaintiff was fired because of the political activities of his wife, the plaintiff would have standing to argue that the provision violated the First Amendment if construed to apply to his wife's political activity. *Id.* at 976 (Loken, J., concurring). Judge Loken believed that rather than allowing the plaintiff's wife standing, the plaintiff should have had standing to assert a claim for injury due to action taken against him because of his wife's political activities:

> What is unusual in this case is that plaintiffs, in their zeal to establish Alma Mendez Thompson's standing to assert an independent claim, barely mentioned in the district court, and argued not at all to this court, that Lloyd Thompson has a First Amendment claim based on the Charter's chilling effect on his wife's freedom to engage in political activities. In my view, plaintiffs' myopia in this regard has led both courts into error. The district court should have considered this aspect of Lloyd Thompson's claim. And this court should remand for that purpose, rather than granting Alma Mendez Thompson standing to assert her own claim.

*Id.*

Wrzesinski also cites two cases from the Sixth Circuit as part of her argument that her First Amendment right was clearly established which held that the employers' actions against the employees based upon the employees' relationships with their spouses violated their First Amendment right of intimate association based upon the marital relationship. In *Adkins v. Magoffin County Board of Education,* 982 F.2d 952 (6th Cir.1993), the court held that the plaintiff presented sufficient evidence to establish a violation of her First Amendment rights of privacy and intimate association. The plaintiff was married to the principal of the high school and was also employed as his secretary. The plaintiff alleged that the superintendent of the county school system refused to recommend the plaintiff for continuation in her position to punish the plaintiff for her affiliation with the principal—the plaintiff's husband—with whom the superintendent had a dispute. The court concluded that the plaintiff presented sufficient evidence to establish a constitutional violation. The plaintiff testified that the superintendent indicated that his decision to fire the plaintiff was because of her relationship with her husband, the principal. The court stated:

> The evidence was clearly sufficient to support a jury determination that Whitaker refused to recommend the plaintiff for continued employment because of her marriage to Diral Adkins. If this reason for his refusal contravened Mrs. Adkins' constitutional rights, the district court erred in directing a verdict for the defendant. While the plaintiff had no contractual right to a job, she could not be deprived of her public employment or exercising a constitutional right.

*Id.* at 955. In *Sowards v. Loudon County,* 203 F.3d 426 (6th Cir.2000), the plaintiff, a jailer at a county jail, was discharged for missing an outstanding warrant on a person lodged in the jail. The plaintiff alleged that the sheriff discharged her because her husband had run unsuccessfully against the incumbent in a previous election. The court held that the plaintiff presented sufficient evidence to prove that the sheriff terminated her in retaliation for the plaintiff's exercise of her First Amendment rights of political and intimate association with her husband. In addition, the court found that the sheriff was not entitled to qualified immunity because the

right of intimate association based upon a marital relationship was clearly established in the Sixth Circuit and because it was objectively unreasonable for the sheriff to believe that the position of a jailer under Tennessee law was the type of position subject to political considerations under the *Elrod/Branti* exception established by the Supreme Court. *Sowards,* 203 F.3d at 438–40.

Although Danielson did not file a brief responding to Wrzesinski's arguments, his counsel did cite *Adler v. Pataki,* 185 F.3d 35 (2d Cir.1999), at oral argument as touching on the claim in this case. The plaintiff in *Adler,* a deputy counsel in the New York State Office of Mental Retardation and Developmental Disabilities, filed suit when he was discharged from his position. He initially alleged that the discharge violated his First Amendment rights of freedom of expression and association by retaliating against him because he did not share the same political philosophy as the governor and because his wife, who was also an attorney with the state, had filed a wrongful discharge lawsuit against the state. The district court dismissed both claims, holding that the plaintiff held a policy-making position and was subject to patronage dismissals and that the plaintiff failed to state a First Amendment retaliation claim even if his discharge was based upon his wife's lawsuit. Later, on appeal, the plaintiff abandoned his claim that he was discharged for political reasons and asserted only that his discharge was based upon his wife's lawsuit. The court held that the plaintiff's allegation that he was fired because of his wife's lawsuit stated a claim for violation of his First Amendment right of intimate association. *Id.* at 41–44. The court observed:

> [T]he New York action challenged here fully accepts the continued existence of Adler's marriage but, according to his claim, seeks to penalize him with loss of his job because of its displeasure with the conduct of his wife. If the First Amendment accords an individual some right to maintain an intimate marital relationship free of undue state interference, Adler's claim properly invokes the protection of that Amendment.

*Id.* at 44.

■ If Wrzesinski has a First Amendment claim in this case it is not because Danielson violated her right of intimate association. In other words, there is no evidence that Danielson discharged Wrzesinski because of her marital relationship with her husband. "A defendant can be held liable for violating a right of intimate association only if the plaintiff shows an intent to interfere with the relationship." *Morfin v. Albuquerque Publ. Schs.,* 906 F.2d 1434, 1440 (10th Cir.1990). In the intimate association cases cited above, the allegations and/or evidence showed that the governmental employer took action against the employee solely because of actions by the employee's spouse or because of animosity toward the spouse. For example, in *Adkins,* the plaintiff alleged that the superintendent refused to renew her job as secretary solely because of his dispute with the plaintiff's husband. In *Sowards,* the plaintiff alleged that the reason given for her discharge was pretext and that the true motivation for her discharge was her husband's unsuccessful campaign against the sheriff in a recent election. In *Adler,* the plaintiff alleged that he was discharged because of a lawsuit filed by his wife. By contrast, the evidence in this case, which is not in dispute, shows that Danielson discharged Wrzesinski for what he believed to be her political activities. Danielson testified that he did not believe Wrzesinski's explanation that her husband put up the signs. (Danielson Dep. at 74–78.) Danielson also testified that he felt Wrzesinski was responsible for the signs, even if her husband did put them up, because she knew she was prohibited from

engaging in political activities and had the ability to control activities at her own home. (*Id.* at 73–74.) Wrzesinski also confirmed that Danielson believed that she was responsible for the signs. (*Id.* at 87.) Thus, Wrzesinski's conduct was the sole motivation for Danielson's decision to discharge Wrzesinski. While it is true that Wrzesinski has submitted evidence, which is not contradicted in the record, that her husband put up the signs on his own, this evidence fails to show that Danielson discharged Wrzesinski for any reason other than what he believed to be Wrzesinski's activities or that he did so with "an intent to interfere with [her marital] relationship." [2] *Morfin,* 906 F.2d at 1440.

The question remains whether Danielson could discharge Wrzesinski based upon yard signs put up by her husband without violating the First Amendment. The answer to this question is no. The *Horstkoetter* case cited by Wrzesinski provides a partial basis for this conclusion. The *Horstkoetter* court recognized that while it is permissible for a governmental employer to place restrictions on employees in some cases, the employer may not extend those restrictions to a spouse's political activities without offending the Constitution. *Horstkoetter* also recognizes that yard signs pose a unique situation because the employee may or may not have control over the placement of yard signs on his property depending on how title is held. If the employee alone holds title to the property, the employee has control over the property thus "has the lawful right to remove political signs from his property, whether placed there by himself, his spouse, or a passerby." *Horstkoetter,* 159 F.3d at 1275. Thus, by refusing to exercise the right to remove the sign, the employee "would seem, at least implicitly, to be adopting the sign as his own, even if the sign was placed there by someone else." *Id.* On the other hand, where the spouse or even a co-resident has an interest in the property, the employee "clearly does not have the right to remove signs placed in [the] yard [ ] by [the] spouse or [co-resident]." *Id.* Requiring the employee to remove the yard signs in that instance or imposing discipline for the employee's failure and/or refusal to remove the signs would be unconstitutional. *Id.* While this Court does not agree entirely with the analysis in *Horstkoetter,* it does agree with the result that case produces when applied to the facts in this case.[3]

**2.** At oral argument Danielson's counsel argued that Wrzesinski's complaint alleged a violation of her First Amendment right to free speech, not a violation of her First Amendment right of intimate association. Wrzesinski's counsel asserted that the complaint adequately alleged a claim for violation of her right of intimate association but even if it did not, she should be given the opportunity to file an amended complaint to assert such a claim. Amendment would not save Wrzesinski's claim, however, because as indicated above, there is no evidence in the record to support a claim for violation of Wrzesinski's First Amendment right of intimate association. Thus, amendment would be futile because the claim could not survive a motion for summary judgment. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1041 (6th Cir.1991).

**3.** This Court believes that the property-based rationale may be too restrictive in that it fails to account for the realities of marriage. The *Horstkoetter* court apparently concludes that where only one spouse owns the marital residence, the relationship can be reduced to one of landlord-tenant. However, the intricacies of marriage are often based upon factors other than property ownership. A rule requiring an employee to remove signs over the objection of the spouse who placed them in the yard based upon the employee's sole ownership of the property certainly touches on the employee's right to intimate association. Moreover, the *Horstkoetter* rule invites abuse by employees who happen to have a joint ownership interest with their spouses. For example, the unscrupulous employee could

Wrzesinski has presented evidence showing her husband was on the election committees of Vance Bates and Kim Ireton, candidates for the offices of Benzie County Sheriff and Clerk of Benzie County, respectively, and that he placed the campaign signs in his yard in early June 2000, while Wrzesinski was on vacation. (Nickelson Aff. ¶¶ 2c.-e., Pl.'s Br. Opp'n Def. Danielson's Mot. Ex. 1.) Wrzesinski has also shown that at the time her husband placed the campaign signs in the yard of their residence, Wrzesinski and her husband owned the property as tenants by the entireties. (Quitclaim Deed from Wrzesinski to Wrzesinski and Nickelson of 6/7/94, Pl.'s Br. Opp'n Def. Danielson's Mot. Ex. 2.) Because Wrzesinski's husband had a right to place the signs on his property, Danielson could not discipline Wrzesinski for that activity without violating her First Amendment rights. The Court would reach this conclusion even if Wrzesinski were the sole owner of the property, however, because the evidence suggests that Wrzesinski was gone when her husband put the signs up and nothing in the record suggests that she had any advance notice or knowledge that he planned to do so. Thus, if Wrzesinski had no knowledge of her husband's intent to put the signs up, she had no control over the situation.

█ The Court's conclusion that Danielson could not discipline or discharge Wrzesinski for the yard signs put up by her husband does not end the inquiry, however, because it must be remembered that this was an employment situation and Danielson was dealing with an employee in whom he had lost trust and confidence; he did not believe her story. Was Danielson

bound to accept Wrzesinski's story if he wished to avoid violating her First Amendment rights? The answer here is maybe. In reaching this conclusion the Court finds guidance from the Supreme Court's decision in *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). The issue presented in that case was whether the test set forth in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), for determining whether speech by a public employee may serve as a basis for disciplining or discharging the employee without violating the First Amendment should be applied to what the employer thought was said or to what the trier of fact determines was said. *Waters*, at 664, 114 S.Ct. at 1882. The plaintiff in *Waters*, a nurse, was discharged for making statements critical of her supervisor, Waters, to another employee, Perkins–Graham, who was considering transferring into the obstetrics department. An employee who overheard the statements, Ballew, reported them to Waters and indicated that the statements had led Perkins–Graham to change her mind about transferring into the department. Ballew confirmed her story in a second interview with Waters. Waters and the hospital's vice president of nursing, Davis, subsequently met with Perkins–Graham, who told them that the plaintiff had made disparaging remarks about Waters and her management of the obstetrics department. The plaintiff's version of the conversation was different than that of Perkins–Graham and Ballew. The plaintiff said that she expressed concerns about the hospital's cross-training policy and told

---

simply ask his or her spouse to place signs in the yard and then claim an inability to do anything about it because the spouse has an interest in the property. Similarly, a confidential employee who holds sole title to the marital property would be required to refrain from posting signs or allowing his or her

spouse to post signs on the property. By quitclaiming the property to himself and his wife, the employee could create a joint tenancy or tenancy by the entireties and his spouse would then be permitted to post signs without concern for negative consequences to the employee.

Perkins–Graham that she had previously informed Waters and Davis of her concerns. The plaintiff also denied making disparaging statements about Waters and claimed that she actually defended Waters and encouraged Perkins–Graham to transfer to obstetrics. The plaintiff's story was consistent with the recollections of two other employees who overheard the conversation. However, Davis and Waters did not speak with those employees and they did not speak with the plaintiff until they informed her of her termination. After the plaintiff filed a grievance contesting her discharge, the president of the hospital met with the plaintiff to hear her side of the story. He also reviewed Waters' and Davis' written reports of their conversations with Ballew and Perkins–Graham and had the vice president of human resources interview Ballew one more time. After considering this evidence, the president denied the grievance.

Following her termination, the plaintiff filed suit claiming that the firing violated her First Amendment rights because her speech was protected under *Connick v. Myers*. Because there were two different versions of speech, one of which was protected, the issue was whether a court should apply the *Connick* test to the speech as the employer found it to be or whether the jury should be permitted to determine the facts for itself. The Supreme Court first recognized that in the area of government employment, speech is afforded less protection than when the government's actions affect a non-employee citizen. When the government acts as employer, additional burdens on speech are justified by the government's interest in efficient operation of government business without employee disruption. *Id.* at 671–75, 114 S.Ct. at 1886–88. The Court observed that like private employers, government employers should be entitled to "rely on hearsay, on past similar conduct, on their personal knowledge of people's

credibility, and on other factors that the judicial process ignores." *Id.* at 676, 114 S.Ct. at 1888. "Government employers should be allowed to use personnel procedures that differ from the evidentiary rules used by courts, without fear that these differences will lead to liability." *Id.* at 676–77, 114 S.Ct. at 1888–89. At the same time, the Court recognized that an employer's decision must reasonable. An employer's decision may be unreasonable if the decision is made without consideration of any evidence or if it is made on extremely weak evidence. *Id.* at 677, 114 S.Ct. at 1889. Thus,

If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care. This need not be the care with which trials, with their rules of evidence and procedure, are conducted. It should, however, be the care that a reasonable manager would use before making an employment decision—discharge, suspension, reprimand, or whatever else—of the sort involved in the particular case.....

Of course, there will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion. In those situations, many different courses of action will necessarily be reasonable. Only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable.

*Id.* at 677–78, 114 S.Ct. at 1889. Applying this test, the Court concluded that if the defendants truly did believe Perkins–Graham's and Ballew's story and fired the

plaintiff because of it, the defendants must win. The Court noted that after hearing Ballew's report, Waters and Davis interviewed Perkins–Graham and then interviewed Ballew again for confirmation. Also, in response to the plaintiff's grievance, the president met with the plaintiff to hear her side of the story and instructed the vice president of human resources to interview Ballew one more time. In denying the grievance, the president had the word of two trusted employees, the endorsement of those employees' reliability by three hospital managers, and the benefit of a face-to-face meeting with the plaintiff. *Id.* at 680, 114 S.Ct. at 1890.

Although *Waters* is not exactly on point, it addresses the situation here, namely, a governmental employer confronted with a situation potentially involving an employee's First Amendment rights. In *Waters*, the employer was confronted with two different versions of a conversation. Here, Danielson was confronted with only one version of what occurred—Wrzesinski's story that she had nothing to do with putting the signs up in her yard. Wrzesinski said her husband did it on his own without her knowledge. Danielson did not believe her, but he did not have any evidence, even hearsay, to refute her story. He made his decision based solely upon his belief that Wrzesinski's story was not true and without speaking to Wrzesinski's husband to confirm Wrzesinski's story. If Danielson had interviewed Wrzesinski's husband, he would have learned that Wrzesinski's husband put the signs up and had his own reasons for doing so. Based upon Danielson's lack of an investigation and lack of evidence to support his decision, the Court concludes that a jury could find that the procedure Danielson used in terminating Wrzesinski was outside the range of what a reasonable employer would use.

## 2. Clearly Established

■ Having determined that Wrzesinski has alleged a violation of her First Amendment rights, the Court must now determine whether the law was sufficiently clear that a reasonable government official in Danielson's position would have known that he was violating Wrzesinski's constitutional rights. Recently, in *Hope v. Pelzer,* —— U.S. ——, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), the Supreme Court recently addressed the question of when a constitutional right is sufficiently clear so as to provide fair notice to the defendant. In *Hope*, the Court rejected the test applied by the Eleventh Circuit that preexisting cases must be "materially similar" to the facts of the case under consideration. Instead, the Court held that the notice or "fair warning" to which a defendant is entitled in a § 1983 civil case is the same as the "fair warning" requirement in criminal cases involving deprivations of civil rights, which is met where " 'prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.' " *Id.* at 2516 (quoting *United States v. Lanier,* 520 U.S. 259, 269, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997)). The degree of specificity required for "fair notice" depends upon the circumstances presented:

This is not to say, of course, that the single warning standard points to a single level of specificity sufficient in every instance. In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvi-

ous clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful."

*Id.* (quoting *Lanier,* 520 U.S. at 270–71, 117 S.Ct. at 1227)(quotations omitted). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.*

Neither party has cited any Supreme Court or Sixth Circuit authority addressing the circumstances in this case. Although Wrzesinski contends that *Adkins* and *Sowards* were sufficient to give Danielson fair warning that he could not discharge Wrzesinski because of her husband's political activity, the Court concludes that those cases are insufficient to provide fair notice to Danielson because, as noted above, those cases involve the right of intimate association in the context of marriage, and there is no evidence in the record that Danielson's decision to discharge Wrzesinski was based upon anything other than what Danielson believed to be Wrzesinski's conduct. The concurring opinion in *International Association of Firefighters of St. Louis, Franklin and Jefferson Counties, Local 2665 v. City of Ferguson,* 283 F.3d 969 (8th Cir.2002), would not give fair notice in this case. First, the decision was issued in 2002 and therefore could not have provided fair notice to Danielson at the time he made his decision to discharge Wrzesinski. Second, the opinion is a concurring opinion and does not represent the holding of the court in that case.

*Horstkoetter* is perhaps closest to this case on a legal and factual basis because it is the only case recognizing that a policy prohibiting employees from putting up political yard signs may be unconstitutional when extended to a spouse who happens to own an interest in the property. There are several important distinctions, howev-

er, which undermine the application of *Horstkoetter* to the facts in this case. In contrast to this case, there was no question in *Horstkoetter* about which spouse placed signs in the yard. Here, Danielson did not believe Wrzesinski's story based upon her prior conduct. *Horstkoetter* provides no guidance on how a governmental employer should proceed in those circumstances. Moreover, *Horstkoetter* does not account for the situation as Danielson saw it: even if the employee's spouse put the sign up and had an ownership interest in the property, if the spouse acted at the direction of the employee it is no different than the employee actually putting up the signs herself. Finally, *Horstkoetter* is not a Sixth Circuit case and there is no reason to believe that the Sixth Circuit would adopt the same analysis or would reach the same conclusions. Accordingly, the Court concludes that the case law as of the date Danielson terminated Wrzesinski was not sufficient to give Danielson fair notice that he was violating Wrzesinski's First Amendment rights.

## B. The County

Wrzesinski has admitted that she does not have a separate claim against the County but named it as a defendant only because it will be responsible for payment of any judgment in this case. Based upon the Court's conclusion that Danielson is entitled to qualified immunity, the Court will also dismiss the claim against the County.

## IV. *Conclusion*

For the foregoing reasons, the Court will grant Defendant Danielson's motion for summary judgment and the County's motion to dismiss.

An Order consistent with this Opinion will be entered.

## ORDER

In accordance with the Opinion filed this date,

**IT IS HEREBY ORDERED** that Defendant Brent Danielson's Motion for Summary Judgment (docket no. 26) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant County of Benzie's Motion to Dismiss (docket no. 27) is **GRANTED**.

This case is **closed**.